FILED
United States Court of Appeals
Tenth Circuit

November 12, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee/Cross-Appellant,

v.

ARLAN DEAN KAUFMAN,

      Defendant - Appellant,

and

LINDA JOYCE KAUFMAN,

      Defendant - Appellant/Cross-Appellee.

Nos. 06-3099, 06-3124, 06-3125,
and 07-3151

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS
(D.C. No. 04-CR-40141-MLB)**

Howard A. Pincus, Assistant Federal Public Defender, Denver, Colorado (Raymond P. Moore, Federal Public Defender, Denver, Colorado, with him on the briefs), for the Defendant-Appellant Arlan Dean Kaufman.

Richard A. Hostetler, Esq., Denver, Colorado, for the Appellant/Cross-Appellee Linda Joyce Kaufman.

Tanya J. Treadway, Assistant United States Attorney, District of Kansas, (Eric F. Melgren, United States Attorney, District of Kansas, and Wan J. Kim, Assistant

Attorney General, Civil Rights Division, United States Department of Justice, with her on the brief), for the Plaintiff/Cross-Appellant United States of America.

Lisa J. Stark (Eric F. Melgren, United States Attorney, District of Kansas; Tanya J. Treadway, Assistant United States Attorney, District of Kansas; Grace Chung Becker, Acting Assistant Attorney General, United States Department of Justice; Jessica Dunsay Silver and Conor B. Dugan, Attorneys, United States Department of Justice, with her on the brief), for the Plaintiff-Appellee United States of America.

Before **HENRY**, Chief Judge, and **BRORBY** and **MCCONNELL**, Circuit Judges.

**HENRY,** Chief Judge.

In November 1999, Butler County, Kansas, deputy sheriffs observed two men working in the nude on a farm outside the town of Newton. As the deputies approached, the defendant, Arlan Kaufman, a doctor of social work who owned the farm and was fully clothed, directed the two workers into a nearby van, where they put on their clothes. Dr. Kaufman explained that the workers were residents of the Kaufman House Residential Care Treatment Center (the Kaufman House), an unlicensed group home for the mentally ill that he owned and operated with his wife, the defendant Linda Kaufman, a licensed nurse.

The deputies' discovery led to an extended investigation of the Kaufman House by county, state, and federal authorities. They learned that, over a period of more than fifteen years, the Kaufmans had directed the severely mentally ill residents of the Kaufman House to perform sexually explicit acts and farm labor in

the nude while maintaining that these acts constituted legitimate psychotherapy for the residents' mental illnesses. Moreover, the Kaufmans billed Medicare and the residents' families for the therapy.

In 2005, a federal grand jury charged the Kaufmans with violating the involuntary servitude and forced labor statutes, health care fraud, mail fraud, and obstructing a federal audit. The government also sought forfeiture of the Kaufmans' assets. A jury convicted each of the Kaufmans of the following offenses: conspiracy (under 18 U.S.C. § 371); two counts of forced labor (under 18 U.S.C. § 1589); three counts of involuntary servitude (under 18 U.S.C. § 1584); sixteen counts of health care fraud (under 18 U.S.C. § 1347); nine counts of mail fraud (under 18 U.S.C. § 1341); one count of obstructing a federal audit (under 18 U.S.C. § 1516); and one count of criminal forfeiture (under 18 U.S.C. § 982). The jury convicted Dr. Kaufman of an additional count of submitting a false document to Medicare (under 18 U.S.C. § 1035).

The district court sentenced Dr. Kaufman to 360 months' imprisonment, upwardly varying from the Guideline range of 160-210 months. In contrast, the court sentenced Mrs. Kaufman to eighty-four months' imprisonment, a downward variance from a Guideline range of 135-168 months. In support of that decision, the court reasoned that Mrs. Kaufman had probably been convicted as an aider and abettor rather than a principal, that she had a dependent personality disorder, and that she had accepted responsibility for the offenses.

The Kaufmans now appeal their forced labor and involuntary servitude convictions, arguing that the district court: (1) violated their rights under the Confrontation Clause of the Sixth Amendment by ordering them to avoid eye contact with the former Kaufman House residents who testified against them at trial without making particularized findings sufficient to justify that restriction; and (2) erred in instructing the jury on the elements necessary to prove the involuntary servitude and forced labor convictions by failing to limit the definitions of "labor" and "services" to "work in an economic sense." Dr. Kaufman's Aplt's Br. at 60. The Kaufmans further argue that (3) the evidence is insufficient to support their convictions on the involuntary servitude count that involved the Kaufman House residents providing labor on the Kaufmans' farm. The Kaufmans acknowledge that they did not raise these issues in the district court proceedings and that, as a result, we may only overturn the challenged convictions by applying the plain error doctrine. See United States v. Barrett, 496 F.3d 1079, 1089 (10th Cir. 2007) (discussing that doctrine), cert. denied, 128 S. Ct. 1646 (2008).

In turn, the government has appealed Mrs. Kaufman's eighty-four month sentence, contending that it was both procedurally and substantively unreasonable. As to procedural unreasonableness, the government contends that the district court erred in declining to impose (1) a four-level enhancement in the offense level under section 2H4.1(b)(2)(A) of the United States Sentencing Guidelines (USSG)

because Mrs. Kaufman used and aided and abetted in the use of a stun gun, which constituted a dangerous weapon; (2) a two-level enhancement under USSG § 3A1.1(b)(2) because Mrs. Kaufman committed offenses that involved a large number of vulnerable victims; and (3) a two-level enhancement under USSG § 3C1.1 because Mrs. Kaufman obstructed justice by interfering with a federal audit and investigations of the Kaufman House by the local sheriff, regulatory authorities, physicians, and family members of the residents.

The government also challenges the substantive reasonableness of Mrs. Kaufman's sentence, arguing that (4) Mrs. Kaufman played a central role in the offenses, did not accept responsibility for them, and should not have been afforded lenient treatment because of her alleged dependent personality disorder.

With regard to the Kaufmans' appeal, we affirm the challenged convictions. The no-eye-contact order causes us the greatest concern. In light of the Supreme Court's decisions in Coy v. Iowa, 487 U.S. 1012 (1988) and Maryland v. Craig, 497 U.S. 836 (1990), the district court may have erred in limiting the opportunity for eye contact between the testifying witnesses and the Kaufmans without making findings sufficient to justify that restriction as to each individual witness. Nevertheless, even assuming that the district court plainly erred, the Kaufmans have failed to establish that the error affected their substantial rights–i.e., that there is "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." United States v. Dominguez Benitez, 542

U.S. 74, 82 (2004) (internal quotation marks omitted).  We further conclude that the district court did not plainly err in instructing the jury on the meaning of "labor" and "services" under the involuntary servitude and forced labor statutes and that the evidence is sufficient to support the Kaufmans' convictions on the involuntary servitude count involving labor on the Kaufmans' farm.

As to the government's appeal, we agree that Mrs. Kaufman's sentence is procedurally unreasonable.  The record contains evidence supporting the "dangerous weapon" and "large number of vulnerable victims" enhancements under USSG §§ 2H4.1(b)(2)(A) and 3A1.1(b)(2), and the district court failed to make findings sufficient to justify its refusal to apply them.  Moreover, the two-level enhancement for obstruction of justice under USSG § 3C1.1 is supported by the record.  Accordingly, we remand the case for resentencing of Mrs. Kaufman and do not reach the government's contention that Mrs. Kaufman's sentence was substantively unreasonable.

## I.  FACTUAL BACKGROUND

The Kaufmans were the joint owners and managers of the Kaufman House Residential Care Treatment Center, an unlicensed residential home for the chronically mentally ill.  They also owned a farm in neighboring Butler County, where some of the offenses occurred.

The Kaufman House actually consisted of three separate houses in Newton, Kansas. Two of the houses served as residences, while the third house served as an office, a meeting place, and the site of some of the "therapy" conducted by the Kaufmans. The Kaufmans acquired these properties in the 1970s. Initially, they were used to provide housing for college students and some mentally ill patients who could not be cared for in other institutions. By the early 1980s, the Kaufman House residents were all mentally ill patients, most of whom suffered from schizophrenia and schizoaffective disorders. Some of the residents lived at the Kaufman House for ten, fifteen, and even twenty years.

The Kaufmans' sole source of income over the period from 1981 until October 2004 (when they were arrested by federal authorities) was the money that they made from the Kaufman House. They obtained their income from room and board payments, Medicare proceeds, social security benefits, and supplemental insurance payments. The Kaufmans billed the government, insurance companies, and the residents' families for psychotherapy and nursing services that they provided at the Kaufman House.

### A. Treatment of Residents at the Kaufman House

The nude farm labor that the Butler County Sheriff's deputies observed in November 1999 was only a small fraction of the unusual practices to which the Kaufman House residents were subjected. In June 2001, agents from the United States Department of Health and Human Services obtained a warrant and

conducted a search of the Kaufmans' residence. In the Kaufmans' bedroom, the agents discovered seventy-eight videotapes, many of which contained graphic scenes of the Kaufman House residents engaging in sexual acts at the express direction of Dr. Kaufman, who was operating the camera.

At trial, an investigator from the Kansas Attorney General's office informed the jury that he had watched forty-eight of the tapes. He reported that forty-four of them contain scenes of the Kaufman House residents appearing in the nude; fourteen tapes show the residents masturbating; six show them massaging one another; and five show them shaving one another's genitals. In several instances, the tapes show Dr. Kaufman touching the genitals of some of the residents (two women and a man). Repeatedly, the camera zooms in on the residents' genitals. The tapes also show Dr. Kaufman directing the residents to engage in particular acts—for example to examine a fellow resident's vagina, to stand in a position so that a resident's penis could be seen by the camera, and to masturbate in front of the camera and the other residents. The prosecution offered some of the tapes into evidence and played portions of them for the jury.

The prosecution also offered testimony from the Kaufman House residents regarding the acts depicted in the tapes. A resident named Kevin, who lived at the Kaufman House from 1979 until 2004, explained that Dr. Kaufman had an interest in nudity and naturalism and spoke of it frequently. In Kevin's view, most of his fellow residents were initially reluctant to remove their clothes, but Dr. Kaufman

persuaded them, in part by stating that the nudity would be therapeutic, particularly with regard to the distorted images that many of the residents had regarding their own bodies. Eventually, at Dr. Kaufman's direction, the Kaufman House developed rules that required some of the residents to be nude when engaging in certain activities—for example participating in group therapy sessions, eating dinner, and watching television. A resident named Jonathan gave similar testimony: Dr. Kaufman had suggested that he should remove his clothes so that he would have less anxiety.

The residents also testified that, in the mid-1990s, they began performing manual labor on the Kaufmans' farm, usually in the nude. The work included removing items from a mouse-infested house, pulling up a tree stump, tearing down a fence, shoveling manure, and moving cement blocks.

The prosecution argued that some of the Kaufman House residents became "undercompensated actors in a never-ending pornographic show." Rec. vol. 20, doc. 477, at 3532. It offered testimony from two psychiatrists, a psychologist, and a social worker that no therapeutic justification existed for the nudity and the sexual acts suggested by Dr. Kaufman, and that the practices depicted on the videotapes were quite harmful to patients suffering from severe mental illnesses like schizophrenia. One of the expert witnesses stated, "I probably can't express how strongly I feel. It is unprofessional. It is awful." Rec. vol. 12, doc. 448, at 704 (direct testimony of Walter Menninger, M.D.). Another expert, a professor of

social work, opined that by simultaneously serving as the residents' therapist, landlord, employer (as to the farm labor), guardian (as to one of them), and travel companion (when he took them on a vacation to a Florida nudist colony), Dr. Kaufman had violated the prohibition on dual relationships set forth in the profession's code of ethics.

The prosecution also offered evidence that the Kaufmans coerced the residents to perform a variety of acts, including the sexual conduct and nudity depicted in the videotapes and the nude manual labor at the Kaufmans' farm. For example, several of the residents testified that the Kaufmans used and threatened to use physical force. On one occasion, Dr. Kaufman grabbed a resident named Barbara by the hair, put his hands over her mouth, and dragged her up the stairs. He often struggled with her and produced welts on her throat. Similarly, a resident named Peter testified that Dr. Kaufman beat him and used a stun gun to subdue him. Other residents testified that Dr. Kaufman demonstrated the stun gun to them.

The residents further testified that the Kaufmans used a seclusion room as punishment. A resident named Nancy reported that the room had neither a bed nor a toilet and that those who were confined there had to use a bucket instead. Kevin reported that Barbara, a fellow resident, was confined in the seclusion room for months at a time. During the period before the residents began to walk around the house in the nude, the Kaufmans would take the clothes of those who were

confined in the seclusion room, using nudity as a form of punishment. The residents added that there were substantial restrictions on their daily activities. Thus, Barbara and a resident named Mary were barred from answering the door and leaving the house without supervision and were often locked in their rooms at night.

Dr. Kaufman also told the residents that they were lucky to be living in the Kaufman House and that other placements would be more restrictive. Residents Barbara, Peter, and Jonathan testified that he threatened them with institutionalization in other mental health facilities if they disobeyed the Kaufman House rules.

Additionally, after the Kaufmans took some of the residents to a nudist colony in Florida, they required them to pay for airfare and other costs by working on the Kaufmans' farm. Kevin testified that the debt never ended, and when some of the residents complained about working on the farm, Dr. Kaufman stated that they stilled owed money for the Florida trip. In the prosecution's view, the Kaufmans also used this indebtedness to compel the nudity, the sexual acts, and the farm labor.

Finally, the residents testified that the Kaufmans developed and maintained a code of silence. The Kaufmans repeatedly told the residents not to share information about the activities at Kaufman House, limited visits and mail from

families and friends, and restricted the information that could be provided to medical personnel and law enforcement officials.

Dr. Kaufman testified in his own defense. He contended that the Kaufman House residents had voluntarily chosen to engage in nudity. As to the sexual acts depicted in the videotapes, Dr. Kaufman maintained that they too were performed voluntarily by the residents. He characterized the sexual behavior as appropriate for residents who had lived together for long periods of time: "I think you have to allow certain kinds of intimacy, physical, emotional, when people are choosing that this is gonna be the family now. . . . " Rec. vol. 18, doc. 472, at 3113. He further contended that his tolerance of the nudity and sexual acts had helped some of the residents stop acting inappropriately in public.

Dr. Kaufman also sought to offer testimony from an expert witness regarding some of his therapeutic techniques. However, after conducting a hearing, the district court ruled the testimony inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).

### B. Trial Proceedings: The No-Eye-Contact Order

A few days before the trial, an attorney representing some of the residents filed a motion requesting a court order that: (1) attorneys and investigators seeking to interview the residents should identify themselves and the parties for

whom they were working before speaking to them; and (2) communications with the residents should be made only through counsel.

In ruling on the motion, the district court stated that it would follow the restrictions previously imposed by a magistrate judge, who had released the Kaufmans on bond. The magistrate judge had stated that the Kaufmans should have no contact, verbal or written, with former residents or family members of former residents. The court then imposed a restriction on eye contact between the Kaufmans and the residents during the trial:

> I'll comment briefly on [the residents'] motion. It is my understanding that [the magistrate judge] restricted defendants' contact with the victims. I am not inclined to change his ruling, especially at this late hour. Defendants will not have contact with the victims in any fashion during the trial without my permission. To the extent possible, defendants will avoid eye contact with the victims when they are in court. I don't want to deal with complaints that defendants are trying to influence or intimidate victims through eye contact.

Rec. vol. 24, doc. 268, at 2 (emphasis added).

The court repeated that directive during a recess in the midst of the government's case. After a prosecutor reported that there had been "a situation" between Dr. Kaufman and Kevin (the former Kaufman House resident), the court stated:

> I don't want to know what happened. I don't care what happened. But I'm telling the Defendants right now so that they clearly understand. I made it clear in a letter to counsel but maybe they didn't see that letter. There isn't going to be any eyeballing of any of these witnesses. There's no eye contact. There's no verbal contact. That is my order. If you violate it, you'll be in contempt[,] and you will go straight to jail.

-13-

Do both of you understand that? There won't be any monetary fines. There won't be any second chances. You'll be in jail for the duration of the trial.

Rec. vol. 15, doc. 458, at 1818.

## C. Verdicts and Sentencing

During the trial, the government dismissed one of the mail fraud counts charged in the indictment. The district court submitted the remaining counts to the jury, which convicted Dr. Kaufman on all of the charged offenses and Mrs. Kaufman on all but count 32 (which alleged making a false writing to Medicare). The jury further found that the Kaufmans should forfeit $85,187.68 for their fraud crimes and should forfeit the houses and the farm because that property had facilitated the involuntary servitude and forced labor offenses.

As to Mrs. Kaufman, the presentence report recommended a base offense level of 22 for the lead offense of involuntary servitude. It then recommended several upward adjustments, three of which are at issue in this appeal: (1) a four-level upward adjustment under USSG § 2H4.1(b)(2)(A) for the use of a dangerous weapon, a stun gun, to discipline and intimidate the victims; (2) a two-level upward adjustment under USSG § 3A1.1(b)(2) because the offenses involved a large number of vulnerable victims; and (3) a two-level upward adjustment for obstruction of justice under USSG § 3C1.1.

Mrs. Kaufman objected, and, prior to sentencing, the district court granted her objections to the dangerous weapon and obstruction of justice enhancements.

-14-

The court also declined to apply the large number of vulnerable victims enhancement. Based on those rulings, the court calculated Mrs. Kaufman's offense level at 33, resulting in a Guideline range of 135-168 months. However, the court imposed a sentence of 84 months. It gave three reasons for that downward variance: (1) "[M]y guess is that the jury did not convict Mrs. Kaufman as a principal, that they convicted her as an aider and abettor;" Rec. vol. 22, doc. 482, at 202; (2) Mrs. Kaufman had a dependent personality disorder; and (3) "I think [Mrs. Kaufman has] accepted responsibility for what's happened here." Id. at 205.

As to Dr. Kaufman, the court calculated his offense level at 35, resulting in a Guideline range of 160-210 months' imprisonment. However, the court upwardly varied, imposing a 360-month sentence. The court also stated that, "unless I'm precluded from doing it . . . , any sentence that I give on a remand will still be 30 years." Id. at 156. Neither the government nor Dr. Kaufman has challenged Dr. Kaufman's sentence in these appeals.

## II.  DISCUSSION

We begin with the issues raised by the Kaufmans in their appeals of their involuntary servitude and forced labor convictions. Then, we turn to the government's appeal of Linda Kaufman's eighty-four month sentence.

### A. The Kaufmans' Appeal of Their Involuntary Servitude and Forced Labor Convictions

### 1. The No- Eye-Contact Order

The Kaufmans first argue that the district court's no-eye-contact order violated their rights under the Confrontation Clause. They acknowledge that they did not raise this issue before the district court. As a result, we may reverse the judgment below only if there is an error that is "plain[,]" which means "clear or obvious at the time of the appeal." United States v. Gonzalez-Huerta, 403 F.3d 727, 732 (10th Cir. 2005) (en banc). Additionally, the error must have affected the Kaufmans' substantial rights: they must show "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." Dominguez Benitez, 542 U.S. at 75 (internal quotation marks omitted). Finally, the error must "seriously affect the fairness, integrity, or public reputation of judicial proceedings." United States v. Trujillo-Terrazas, 405 F.3d 814, 818 (10th Cir. 2005). "[W]e will only exercise our discretion when an error is particularly egregious and the failure to remand for correction would produce a miscarriage of justice." Id. (internal quotation marks omitted).

We turn first to the question of whether the district court plainly erred in imposing the no-eye-contact order. That inquiry requires us to examine Supreme Court jurisprudence regarding the Confrontation Clause.

### a. The "face-to-face" requirement of the Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . . " U.S. CONST. amend. VI. The bloodline of this venerated right is long, and reaches into antiquity. See Richard D. Friedman, Confrontation: The Search for Basic Principles, 86 GEO. L. J. 1011, 1022-23 (1998) ("We are used to the idea that witnesses testify under oath in an open proceeding in the presence of the accused, 'face-to-face.' This was the practice of the ancient Hebrews and Romans, and for centuries it has been the English way."). When the Framers sought to protect this right, they were particularly concerned about the 16th and 17th century practice of trial by affidavit in some of the English courts. See White v. Illinois, 502 U.S. 346, 361 (1992) (Thomas, J., concurring in part and concurring in the judgment) (citing the trial of Sir Walter Raleigh on charges of treason, in which the primary evidence against him was a confession of an alleged co-conspirator that was repudiated before trial and probably obtained by torture, as "a well-known example of this feature of English criminal procedure" and observing that "[a]pparently in response to such abuses, a common-law right of confrontation began to develop in England during the late 16th and early 17th centuries"); Friedman, 86 GEO. L.J. at 1024 (concluding that "beginning even before the middle of the sixteenth century, we find repeated demands by treason defendants that their accusers be brought 'face-to-face,' and

-17-

also repeated statutory support for this position. By the middle of the seventeenth century, this position, and the accused's right to examine the witnesses, had prevailed.").

The Clause provides defendants with both "the right to face physically" the government's witnesses and "the right of cross-examination." United States v. Begay, 937 F.2d 515, 520 (10th Cir. 1991). Here, the Kaufmans do not dispute that they were afforded the right of cross-examination. It is their right to face the former Kaufman House residents that they maintain was violated by the district court's no-eye-contact order.

The Supreme Court's decision in Coy v. Iowa, 487 U.S. 1012 (1988), contains its most extensive discussion of the face-to-face component of the Confrontation Clause. There, two children who alleged that the defendant had sexually abused them were allowed to testify behind a screen. The defendant could dimly perceive the witnesses, but the witnesses could not see him at all. An Iowa statute permitted that practice.

The Supreme Court overturned the defendant's convictions. It explained that even though most of its prior Confrontation Clause cases had involved restrictions on cross examination and the admission of out-of-court statements, "[w]e have never doubted . . . that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." 487 U.S. at 1016. The defendant in Coy was deprived of such a meeting. The

screen employed by the trial court was designed to enable the witnesses to avoid viewing the defendant when they testified, and the record indicated that it had accomplished that purpose. For the Supreme Court,"[i]t [was] difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." Id. at 1020.

The Court found support for its reading of the Confrontation Clause in "the beginnings of Western legal culture." Id. at 1015. Discussing the prosecution of Saint Paul, the Greek Bible quotes the Roman Governor Festus: "'[i]t is not the manner of the Romans to deliver any man up to die before the accused has met his accusers face to face, and has been given a chance to defend himself against the charges.'" Id. at 1015-1016 (quoting ACTS 25:16). Additionally, the Latin derivation of "confront" provided support for the defendant's right to a face-to-face encounter: the word "ultimately derives from the prefix 'con-' (from 'contra' meaning 'against' or 'opposed') and the noun 'frons' (forehead)." Coy, 487 U.S. at 1016.

As the Second Circuit has thoughtfully observed, Coy discusses several components of the face-to-face encounter between a defendant and a witness. See Morales v. Artuz, 281 F.3d 55, 59-60 (2d Cir. 2002). First, Coy notes the effect upon the witness of viewing the defendant while testifying. "A witness 'may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what

sort of human being that man is.'" 487 U.S. at 1019 (quoting CHAFEE, THE BLESSINGS OF LIBERTY 35 (1956) (other citation omitted)). "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back[,]'" id. 1019, and "[t]he phrase still persists, 'Look me in the eye and say that.'" Id. at 1018. Second, Coy invokes Confrontation Clause decisions that describe the defendant's right to look at the witnesses while being tried. Id. at 1016-17 (discussing Kirby v. United States, 174 U.S. 47, 55 (1899)). Third, Coy suggests that the face-to-face encounter between the defendant and the witness may provide the jury with important information in assessing the witnesses's credibility. See id. at 1019 (observing that "[t]he Confrontation Clause does not, of course, compel the witness to fix his eyes on the defendant, he may studiously look elsewhere, but the trier of fact will draw its own conclusions"); see also Morales, 281 F.3d at 60 (stating that "[t]he Court has noted the virtue 'of compelling the witness to stand face to face with the jury in order that they may look at him and judge by his demeanor upon the stand and the manner which he gives his testimony whether he is worthy of belief'") (quoting California v. Green, 399 U.S. 149, 158 (1970) (other internal quotation marks omitted) (emphasis in Morales)).

Importantly, Coy left for another day the question of whether there were exceptions to "the irreducible literal meaning of the Clause: a right to meet face to face all those who appear and give evidence at trial." Coy, 487 U.S. at 1021 (emphasis in Coy) (internal quotation marks omitted). However, it did reject the

prosecution's argument that the generalized finding in the Iowa statute (that child witnesses would be traumatized by testifying in view of a defendant) was sufficient to establish such an exception.

Two years later, in Maryland v. Craig, 497 U.S. 836 (1990), the Court concluded that there were exceptions to the Confrontation Clause's face-to-face requirement. There, four child witnesses testified by a one-way closed-circuit television procedure authorized by a Maryland statute. In contrast to Coy, the trial court in Craig made individualized findings that each of the child witnesses needed special protection.

The Craig Court approved that general approach: "[T]he Confrontation Clause reflects a preference for face-to-face confrontation at trial, . . . a preference that must occasionally give way to considerations of public policy and the necessities of the case." Id. at 849 (emphasis in original) (citations and internal quotation marks omitted). "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where a denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Id. at 850. The Court emphasized that "[t]he requisite finding of necessity must of course be a case-specific one." Id. at 855. Moreover, the prosecution could not meet its burden by offering evidence that the witnesses would be traumatized by testifying in the courtroom. Instead, the prosecution was required to show that it

was the presence of the defendant that would cause the trauma. And finally, "the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than mere nervousness or excitement or some reluctance to testify." Id. at 856 (internal quotation marks omitted). The Craig Court remanded the case for the appropriate, witness-specific inquiry.

### b. The parties' arguments

Now, invoking Coy, the Kaufmans argue that the district court's no-eye-contact order violated their right to a face-to-face encounter with the former Kaufman House residents who testified at trial. Even though the residents could see the Kaufmans, and even though both the Kaufmans and the jury could see the residents, the Kaufmans maintain that the no-eye-contact order constituted at least as substantial a violation of their Confrontation Clause right as the protective screen in Coy and the closed circuit television systems in other cases. They reason that, in light of the no-eye-contact order, the testifying residents had no reason not to look at the Kaufmans, because the Kaufmans could not look back at them. Therefore, the Kaufmans maintain, the jurors would have found the former residents' testimony supported by the fact that they could so easily look at the Kaufmans while making such serious allegations against them. At the same time, the fact that the Kaufmans could not look at the residents, or would have to look away immediately should any eye contact be made, would damage the Kaufmans'

credibility. "The most obvious reason for [the Kaufmans] to studiously look elsewhere would be that [the Kaufmans] knew that what they were accusing [them] of was the truth." Dr. Kaufman's Aplt's Br. at 40. In the Kaufmans' view, the fact that the district court did not inform the jury of the no-eye-contact order made such an inference all the more probable.

Citing Craig, the Kaufmans further argue that the district court did not sufficiently justify the no-eye-contact order's substantial limitation on their Confrontation Clause rights. In this regard, the Kaufmans observe that the district court did not take evidence before it imposed the restriction, and it did not make findings as to the need to avoid eye contact as to any particular resident. They observe that the motion (filed by the former residents' attorney) that triggered the no-eye-contact order did not even request such a ruling. Instead, it merely sought to limit the contact between the Kaufmans' investigators and the residents prior to trial.

In response, the government reads the Confrontation Clause, and the language in Coy, more narrowly than the Kaufmans. It observes that former residents testified in the courtroom before both the Kaufmans and the jury, that there was no barrier that prevented the residents from looking at the Kaufmans, and that the Kaufmans and the jury were able to observe the witnesses. Thus, in the government's view, despite the no-eye-contact order, the Kaufmans were provided with what Coy requires: a face-to-face meeting with witnesses appearing before the trier of fact.

Additionally, the government argues that even if the no-eye-contact order infringed the Kaufmans' Confrontation Clause rights to some extent, the district court made findings sufficient to justify the ruling under Craig. The order was supported by a clear public policy reason—to prevent the Kaufmans from interfering with and intimidating the former residents, and it was based on the evidence that the Kaufmans had sought to contact the residents prior to trial.

### c. Plain error

There is considerable support for the Kaufmans' contention that the district court erred in issuing the no-eye-contact order. Absent the findings described in Craig, the Confrontation Clause requires that the government present its case through witnesses "'who confront [the defendant] at trial, [and] upon whom he can look while being tried.'" Coy, 487 U.S. at 1017 (quoting Kirby, 174 U.S. at 55). Coy's discussion of not merely a face-to-face meeting generally but eye contact in particular indicates that, when a defendant and a witness appear in the courtroom together, eye contact, or the lack of it, is an important part of the encounter. See id. at 1019 (observing that although the "[t]he Confrontation Clause does not . . . compel the witness to fix his eyes upon the defendant[,]" the trier of fact should be allowed to draw its own conclusions if the witness looks elsewhere). And, as Justice Kennedy has observed, "[i]t is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to

-24-

testify and rights under the Confrontation Clause." Riggins v. Nevada, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring). Thus, "the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." Id.

Here, the district court's order limited the opportunity for eye contact between the Kaufmans and the residents and was directed at the Kaufmans' "manner [and] facial expressions[.]" Id. However, the district court did not inform the jury of the no-eye-contact order, and the jury was therefore constrained in drawing its own conclusions about the manner in which the residents and the Kaufmans confronted one another in the courtroom.

In questioning the no-eye-contact order, we do not suggest that such an order could not be justified. Indeed, a number of appellate courts have upheld trial court decisions limiting direct eye contact between defendants and particularly vulnerable witnesses, such as children alleging that they have been abused by their parents. See, e.g., Ellis v. United States, 313 F.3d 636, 650, 652 (1st Cir. 2002) (concluding that a trial court order allowing a witness to sit in a chair facing the jury but facing away from the defendant was neither "unreasonable" nor "obviously wrong" because the trial judge had "carefully documented the considerations that had prompted him to resort to a modified seating arrangement," i.e., that "given the nature of [the child's] testimony, the child—who was nine years old at the time of trial—likely would have difficulty testifying in a public

-25-

forum, and that she might reasonably fear testifying in front of the [defendant]");

Smith v. Arkansas, 8 S.W.3d 534, 537 (Ark. 2000) (affirming a similar order);

Utah v. Hoyt, 806 P.2d 204, 209 (Utah Ct. App. 1991) (same); Ortiz v. Georgia,

374 S.E.2d 92, 95-96 (Ga. App. 1988) (same). But see Commonwealth v.

Amirault, 677 N.E.2d 652, 662-74 (Mass. 1997) (concluding that the seating of the

defendants behind and to the side of child witnesses violated Article 12 of the

Massachusetts Declaration of Rights, which expressly provides for "face to face"

confrontation, but further holding that the defendants had waived the issue in light

of the statements of trial counsel). Here, given the residents' history of chronic

and severe mental illness and the Kaufmans' exercise of control over them for an

extended period of time, some kind of order limiting the eye contact between the

Kaufmans and the residents might also have been warranted.

However, the district court heard no evidence regarding the justification for

the order and made no particularized findings. As the Kaufmans observe, the

court did not explain the need for the limitation on eye contact as to each resident

individually; the court did not find that eye contact would cause intimidation; and

it did not find that the resulting intimidation would be beyond the permissible

effect of confrontation generally.

Nevertheless, even assuming that the district court plainly erred, we

conclude for the reasons set forth below that the Kaufmans have not established

the prejudice required to obtain relief under the plain error analysis.

## d.  Prejudice

The Kaufmans argue that the failure to justify the no-eye-contact order prejudiced their substantial rights–i.e., there was a reasonable probability of a different outcome if the error had not occurred.  See Dominguez Benitez, 542 U.S. at 75.  They rely on the Supreme Court's harmless error analysis in Coy.

There, in assessing the effect of the screen placed in front of the witness, the Court explained:

> We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, and see no reason why denial of face-to-face confrontation should not be treated the same. An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.

487 U.S. at 1021-22 (emphasis added) (citation omitted).

The Kaufmans contend that this same approach should be used here with regard to the prejudice prong of the plain error analysis.  In their view, we must disregard all of the testimony from the residents and then decide, absent that testimony, whether the jury still would have convicted them on the forced labor and involuntary servitude counts.

The government disagrees.  In its view, even if there was a Confrontation Clause error, the harmless error analysis in Coy is inapplicable.  In Coy, the government maintains, the limitation on the defendant's Confrontation Clause had an obvious effect:  the screen was present, the defendant and the witness could not

-27-

see one another, and the jury could not see the witness. In contrast, the government maintains, the harm here is purely speculative: there is no indication that the no-eye-contact order had any practical effect on the Kaufmans' defense.

On this point, we agree with the government. Many courts have followed Coy's approach when a screen has been placed in front of the witness, when the witness or the defendant has been removed from the courtroom, and when the trial court has failed to make findings sufficient to justify those procedures. See, e.g., Gray v. Moore, 520 F.3d 616, 627-28 (6th Cir. 2008) (applying Coy in a habeas corpus proceeding by completely discounting testimony given when the defendant was erroneously removed from the courtroom); United States v. Turning Bear, 357 F.3d 730, 741 (8th Cir. 2004) (concluding that a witness's "closed-circuit television testimony must be entirely excluded because it would be pure speculation to consider whether the child's testimony, or the jury's assessment of that testimony, would have changed had there been proper confrontation") (internal quotation marks omitted); United States v. Moses, 137 F.3d 894, 901-02 (6th Cir. 1998) (completely discounting evidence given by closed circuit television). However, when, as here, the defendant and the jury have been afforded an opportunity to view a witness in the courtroom, the analysis of several courts suggests that the Coy approach may not be applicable–even though there has been some limitation on eye contact between the defendant and the witness.

-28-

For example, in Ellis, 313 F.3d at 646-53, the trial court allowed a child witness to testify in a chair facing the jurors but facing away from the petitioner. The witness could only have made eye contact with the defendant by looking over her right shoulder, and she did not avail herself of that opportunity. Although the First Circuit concluded that the trial court had made sufficient findings to justify the seating arrangement and the resulting limitation on eye contact, it also observed that there were indicia of reliability that weighed against overturning the conviction. In particular, the court noted "the absence of any opaque physical barrier and the fact that the witness was required to give live testimony, under oath, in the presence of both the defendant and the jury. To the extent that nervousness, body language, demeanor, and the like are important indicia of credibility, the jurors' entirely unimpaired view of the witness is persuasive." Id. at 651 (internal citation omitted).

Similarly, in Morales, the Second Circuit concluded that a state court judge had not unreasonably applied federal law regarding the Confrontation Clause by allowing a witness who had exhibited a great fear of the defendant to testify in dark sunglasses. That conclusion was based in part on the observation that the trial judge's decision "resulted in only a minimal impairment of the jurors' opportunity to assess [the witness's] credibility." 281 F.3d at 60-61. "Even if we accept the idea, grounded perhaps more on tradition than on empirical data, that demeanor is a useful basis for assessing credibility, the jurors had an entirely

-29-

unimpaired opportunity to assess the delivery of [the witness's] testimony, notice any evident nervousness, and observe her body language." Id. at 61. Most importantly, the jurors "had a full opportunity to combine these fully observable aspects of demeanor with their consideration of the substance of her testimony, assessing her opportunity to observe, the consistency of her account, any hostile motive, and all the other traditional bases for evaluating testimony. All that was lacking was the jury's ability to discern whatever might have been indicated by the movement of her eyes." Id.

The reasoning in Ellis and Morales supports the government's view that the testimony of the residents need not be discounted entirely in assessing whether the no-eye-contact order prejudiced the Kaufmans. Like the juries in those cases, the jury here had a similar opportunity to assess the resident's credibility using the "traditional bases for evaluating testimony." Id.

We acknowledge that the Kaufmans have offered one possible scenario resulting from the no-eye-contact order that the jury might have found significant—a resident witness attempting to look directly at the Kaufmans while the Kaufmans, in an effort to comply with the court's order, looked away. Nevertheless, it is by no means clear that the alternative scenario, which the no-eye-contact order sought to preclude (i.e., the Kaufmans returning eye contact initiated by the testifying residents), would have made the Kaufmans more believable in the jury's view. In particular, had the Kaufmans returned the hypothesized eye contact, it is entirely possible that the jury might have

-30-

interpreted such behavior as the effort of a guilty party to use a prior relationship to intimidate a particularly vulnerable group of witnesses. See Bryant v. Maryland, 741 A.2d 495, 501 (Md. Ct. Spec. App. 1999) (stating that "[t]here may be any number of reasons why a defendant will not fix his or her gaze upon a witness, including a possible earlier instruction by defense counsel to avoid any possible implication that the defendant is attempting to intimidate or 'stare down' a witness").

Of course, we do not and cannot know whether the resident witnesses attempted to look directly at the Kaufmans, whether the Kaufmans looked away, and what inferences, if any, the jury drew from any of this. But that very lack of knowledge undermines the Kaufmans' argument. Unlike Coy, in which the government had the burden of demonstrating that the Confrontation Clause violation was harmless beyond a reasonable doubt, see 487 U.S. at 1021-22, it is the Kaufmans who have the burden of establishing prejudice under the third part of the plain error inquiry here. And when the record indicates that there were two such equally likely alternatives, a party has not established prejudice under the plain error standard. See Jones v. United States, 527 U.S. 373, 394-95 (1999) (observing that when two hypothesized scenarios are equally likely to have occurred "the effect of an alleged error is so uncertain [that] a defendant cannot meet his burden of showing that the error actually affected his substantial rights").

Finally, it is noteworthy that one of the defendants, Dr. Kaufman, testified in his own defense. He offered a detailed explanation of his treatment of the

Kaufman House residents and his approach to psychotherapy. His account differed from the residents' in important respects. Dr. Kaufman was then subjected to extensive and vigorous cross-examination by the prosecution. That testimony, along with the voluminous other evidence in the case, gave the jurors an ample opportunity to assess the credibility of the Kaufman House residents and the weight of the prosecution's case. That fact further undermines the Kaufmans' claim that the hypothesized downward glances during the residents' testimony establish a reasonable probability of a different result.

We therefore conclude that the Kaufmans have not established that the district court's issuance of the no-eye-contact order affected their substantial rights. Accordingly, they are not entitled to relief on their Confrontation Clause claim. Cf. United States v. Levenite, 277 F.3d 454, 465 (4th Cir. 2002) (applying the plain error doctrine to reject the defendants' claim "that they individually, as distinct from their counsel, could not see the faces of witnesses and that this violated the Sixth Amendment"); United States v. Iron Moccasin, 878 F.2d 226, 230 (8th Cir. 1989) (applying the plain error doctrine to reject the defendant's Confrontation Clause claim that the placement of an easel blocked the line of vision between the defendant and a witness).

### 2. Jury instructions on the forced labor and involuntary servitude counts

Next, the Kaufmans argue that the district court erred in defining "labor" and "services" when it instructed the jury on the involuntary servitude and forced labor counts. At issue here are counts 2-5 of the indictment. Counts 2 and 3 alleged violations of the forced labor statute, 18 U.S.C. § 1589, with regard to labor or services provided by Kaufman House residents Mary and Barbara respectively. Counts 4 and 5 alleged violations of the involuntary servitude statute, 18 U.S.C. § 1584, as to the same two residents.

In assessing the Kaufmans' argument, we begin with the terms of the relevant statutes. The involuntary servitude statute, 18 U.S.C. § 1584, establishes an offense for "knowingly and willfully hold[ing] to involuntary servitude or sell[ing] into any condition of involuntary servitude, any other person for any term." The forced labor statute, 18 U.S.C. § 1589, provides, in part:

> Whoever knowingly provides or obtains the labor or services of a person--
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
>
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>
> (3) by means of the abuse or threatened abuse of law or the legal process, shall be fined under this title or imprisoned not more than 20 years, or both.

Neither statute defines the terms "involuntary servitude," "labor," or "services."

However, Instruction 14C, which explained the involuntary servitude counts, stated that:

The term "involuntary servitude" means a condition of compulsory service in which the alleged victim is compelled to perform labor or services against the victim's will for the benefit of a defendant due to the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process.

Rec. vol. 5, doc. 305, instr. 14C.

Instruction 16 informed the jury that, in deciding whether the Kaufmans had violated the forced labor statute,

[Y]ou must decide whether the defendant obtained the labor or services of another person, namely, the alleged victim named in that particular count of the indictment. "Obtain" means to gain, acquire, or attain. "Labor" means the expenditure of physical or mental effort. "Services" means conduct or performance that assists or benefits someone or something.

Id., instr. 16.

Instruction 14C did not contain a separate definition of "labor" or "services," and we therefore assume, as do the parties, that the jury applied the definitions set forth in instruction 16 to the involuntary servitude offenses as well.

The Kaufmans did not object to either instruction at trial. Nevertheless, they now maintain that the district court committed plain error because the definitions of "labor" and "services" were too broad. In their view, the definitions allowed them to be convicted for inducing the nudity and the sexual acts recorded on the videotapes. According to the Kaufmans, the involuntary servitude and forced labor statutes apply only to "labor or services" that constitute "work in an economic sense," Dr. Kaufman's Aplt's Br. at 60, and the acts on the videotapes cannot be fairly characterized as such work.

-34-

The Kaufmans reason that, as to 18 U.S.C. § 1584, Congress borrowed the phrase "involuntary servitude" from the Thirteenth Amendment.  In the Supreme Court's view, the phrase was intended to cover "'compulsory labor akin to African slavery, which in practical operation would tend to produce like undesirable results.'"  Dr. Kaufman's Aplt's Br. at 62 (quoting United States v. Kozminski, 487 U.S. 921, 942 (1988) (other internal quotation marks omitted)).  The Kaufmans maintain that the Supreme Court decisions applying the Thirteenth Amendment generally involve "work that was economic in nature."  Dr. Kaufman's Aplt's Br. at 63.  In their view, the same limitation applies to the "labor" and "services" covered by § 1589.

We are not persuaded by the Kaufmans' arguments.  First, as the government observes, the jury instructions' definitions of "labor" and "services" set forth the ordinary meaning of those terms.  See 8 OXFORD ENGLISH DICTIONARY 559 (2d ed. 1989) (defining "labour" as "[e]xertion of the faculties of the body or mind, esp. when painful or compulsory; bodily or mental toil"); 15 OXFORD ENGLISH DICTIONARY 34, 36 (2d ed. 1989) (defining "service" as "[t]he condition of being a servant; the fact of serving a master" and as "[t]he action of serving, helping, or benefitting; conduct tending to the welfare or advantage of another"); see also Hackwell v. United States, 491 F.3d 1229, 1233-34 (10th Cir. 2007) (relying on the RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE's definition of services as "the performance of any duties or work for another").

Moreover, the authorities on which the Kaufmans rely do not establish that "labor" and "services" under the involuntary servitude and forced labor statutes are limited to "work in an economic sense." In Kozminski, 487 U.S. at 945, the Supreme Court considered the "involuntary" component of the phrase "involuntary servitude" in § 1584. The Court concluded that Congress had borrowed the phrase from the Thirteenth Amendment, and it therefore interpreted the statute "in a way consistent with the understanding of the Thirteenth Amendment that prevailed at the time of § 1584's enactment." Id. at 945. Rejecting the government's argument, the Court held that "compulsion of services by the use or threatened use of physical coercion is a necessary incident of a condition of involuntary servitude." Id. at 952. Kozminski thus addressed the means by which services are coerced, but it did not determine what kinds of services are covered by § 1584. See id. at 942 (stating that "while the general spirit of the phrase 'involuntary servitude' is easily comprehended, the exact range of conditions it prohibits is harder to define").

As to the forced labor statute, § 1589, we note that Congress enacted it as part of the Trafficking Victims Protection Act of 2000, a subset of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (2000). See United States v. Bradley, 390 F.3d 145, 150 (1st Cir. 2004) (discussing § 1589). The stated purpose of the Trafficking Victims Protection Act is to "combat trafficking in persons, a contemporary manifestation of slavery

-36-

whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."  22 U.S.C. § 7101(a).

The legislative history reveals that, in enacting § 1589, Congress sought to expand <u>Kozminski</u>'s limited definition of coercion under § 1584, stating that "[s]ection 1589 will provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in <u>Kozminski</u>."  <u>See</u> H.R. Conf. Rep. No. 106-939, at 101, <u>as reprinted in</u> 2000 U.S.C.C.A.N. 1380, 1393.  There is no indication that Congress sought to limit the scope of  "labor or services" in the manner suggested by the Kaufmans.

We acknowledge that many cases invoked by the Kaufmans and interpreting the Thirteenth Amendment, § 1584, and § 1589 involve "work that was economic in nature" and describe slavery and involuntary servitude in economic terms.  <u>See, e.g.</u>, <u>Pollock v. Williams</u>, 322 U.S. 4, 17 (1944) ("The undoubted aim of the Thirteenth Amendment as implemented by the Antipeonage Act was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States.").  Nevertheless, the authorities invoked by the Kaufmans also describe slavery and involuntary servitude in a broader fashion. For example, in <u>Bailey v. Alabama</u>, 219 U.S. 219 (1911), the Court stated that

> [t]he words involuntary servitude [in the 13th Amendment] have a larger meaning than slavery. . . . The plain intention was to abolish slavery <u>of whatever name and form and all its badges and incidents</u>; to render impossible <u>any state of bondage</u>; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit, which is the essence of involuntary servitude.

Id. at 241 (emphasis added) (internal quotation marks omitted).

Moreover, the fact that these various authorities describe slavery in economic terms does not mean that was all there was to the institution or that the Thirteenth Amendment and the subsequent legislation implementing it apply only to economic relationships. Indeed, scholars have discerned a broader meaning in the condition of slavery and the legislation that abolished it. In Professor Amar's assessment, "many slaves were in fact the victims of sadism and torture rather than being put in the fields[,] . . . and yet they were surely covered by the core of the Thirteenth Amendment." Akhil Reed Amar, Remember the Thirteenth, 10 CONST. COMMENT. 403, 405 (1993); Neal Kumar Katyal, Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution, 103 YALE L. J. 793, 796, 811 (1993) (observing that "the context of coerced prostitution, which involves compelled sexual chores, surrounds the Thirteenth Amendment's prohibition against forced labor"). That analysis supports the government's contention that §§ 1584 and 1589 are applicable here. In our view, if an antebellum slave was relieved of the responsibility for harvesting cotton, brought into his master's house, directed to disrobe and then engage in the various acts performed by the Kaufman House residents on the videotapes (e.g., masturbation and genital shaving), his or her condition could still be fairly described as one of involuntary servitude and forced labor.

The Fourth Circuit's recent decision in United States v. Udeozor, 515 F.3d 260 (4th Cir. 2008), supports that conclusion. There, the government charged a

physician and her husband with conspiring to hold a fourteen-year-old girl in involuntary servitude, as defined in § 1584. The evidence at trial revealed that the defendants had required the girl to care for their children, to clean their house, to cook for them, and to work in the physician's medical office, all without compensation. Additionally, the girl testified that the husband had forced her to have sexual intercourse with him.

In affirming the conviction, the Fourth Circuit stated that the sexual abuse was "a badge and incident of servitude which is distressingly common, not just historically, but for young women who find themselves in coercive circumstances today." Id. at 266 (emphasis added). That statement that suggests that sexual acts that have been coerced by other means are covered by the involuntary servitude statute.

Moreover, in United States v. Marcus, 487 F. Supp. 2d 289 (E.D. N.Y. 2007), vacated on other grounds, 538 F.3d 97 (2d Cir. 2008), a district court relied on the ordinary meaning of the terms "labor" and "services" in rejecting a similar challenge to a forced labor conviction. See id. at 300 (citing the definition of "labor" as "an 'expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory'" and the definition of "services" as "'useful labor that does not produce a tangible commodity'") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (2002)). The Marcus court also supported its holding by considering the legislative history of § 1589, stating that "while the legislative history does not address situations where traffickers have

intimate relationships with their victims, the court's survey of the [Trafficking Victims Protection Act's] legislative history reveals no expressed intention to preclude criminal liability in those contexts." Id. at 301.

In light of those authorities, we are persuaded that the involuntary servitude and forced labor statutes apply to coerced acts other than "work in an economic sense." Accordingly, the district court did not plainly err in instructing the jury as to the definitions of "labor" and "services" covered by those provisions.

### 3. Evidence supporting the involuntary servitude offense alleged in count 6

Finally, the Kaufmans challenge the sufficiency of the evidence supporting the involuntary servitude offense charged in count 6, which alleged that they coerced residents Kevin, Jonathan, and James to perform nude labor on the Kaufmans' farm, in violation of the involuntary servitude statute, 18 U.S.C. § 1584. The indictment asserted that the Kaufmans held all three men in a condition of involuntary servitude, but the instructions directed the jury to make separate findings as to each resident. On the verdict form, the jury indicated that it had found unanimously that the Kaufmans had held Kevin and Jonathan in involuntary servitude but it made no such finding as to James. In light of the Kaufmans' concession at oral argument that the government need only prove the elements of the offense as to either Kevin or Jonathan, we address the evidence only as to Kevin, which constitutes the stronger claim.

"[W]e review sufficiency of the evidence claims de novo, asking only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find [the defendant] guilty beyond a reasonable doubt." United States v. Allen, 235 F.3d 482, 492 (10th Cir. 2000) (internal quotation marks omitted). In reviewing the evidence in this light, we do not inquire into the jury's credibility determinations or its conclusions regarding the weight of the evidence. Id. Moreover, the evidence presented "need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." United States v. Bowen, 437 F.3d 1009, 1014 (10th Cir.2006) (internal quotation marks omitted). Instead, the evidence need only reasonably support the jury's finding that the defendant is guilty of the offense beyond a reasonable doubt.

The Kaufmans concede that, in the district court proceedings, they did not challenge the sufficiency of the evidence as to the farm labor count. However, this fact does not affect our standard of review here. Even though we must review their sufficiency of the evidence claim for plain error, "a conviction in the absence of sufficient evidence of guilt is plainly an error, clearly prejudiced the defendant, and almost always creates manifest injustice." United States v. Goode, 483 F.3d 676, 681 n.1 (10th Cir. 2007). Therefore, plain error review and de novo review are functionally equivalent so long as the fourth prong of plain error review–that

the error seriously affects the fairness, integrity, or public reputation of judicial proceedings–is also met.  Id.

In support of their argument, the Kaufmans invoke the testimony of Kevin that he wanted to work on the farm in the nude.  In particular, when Butler County sheriff's deputies interviewed him in 1999, Kevin said that he worked in the nude and he enjoyed it, that he thought it was good for him, that he gained a lot from it, and that it was his choice.  The Kaufmans maintain that, in light of this testimony, the government did not establish that the farm labor was coerced.

The Kaufmans further argue that the government failed to offer evidence sufficient to show that the work on the farm was coerced in the particular manner required by the statute (i.e., "the compulsion of services by the use or threatened use of physical or legal coercion," Kozminski, 487 U.S. at 948  (interpreting 18 U.S.C. § 1584)).  They point to the fact that Kevin, when explaining why he worked on the farm, stated that he would be ridiculed if he did not.  They argue that the ridicule Kevin referenced was merely a statement by Dr. Kaufman that if Kevin had energy to go for a walk, then he also had energy to work on the farm.  That kind of ridicule, the Kaufmans maintain, is not sufficient to establish the required use or threatened use of physical or legal coercion.

We are not persuaded.  Although Kevin admitted during his trial testimony that he had made the statements about his enjoyment of the farm labor and its beneficial effects, he also explained to the jury that his view had changed:  upon

leaving the Kaufman House, working with a different therapist, and reflecting on

his experience with the Kaufmans, he had come to believe that "going out to the

farm . . . was not a choice" and was "not voluntary." Rec. vol XV, at 1730, 1841.

Kevin also discussed the reasons for this change in his views. He told the

jury that performing manual labor in the nude was Dr. Kaufman's idea and that Dr.

Kaufman told the residents that the work would be therapeutic. Discussing the

origins of nudity at the Kaufman House, Kevin added, "[Dr. Kaufman] gave a lot

of encouragement. I don't think I would have ever done it had I not received some

encouragement from him . . . . In fact [,] I know I wouldn't have." Id. at 1705.

In addition, Kevin stated, "Arlan Kaufman[,] at the time I lived in the Kaufman

House[,] was the most important person in the world to me . . . . [W]hen I came to

Kaufman House, I was 20 years old and I needed someone to look up to." Id. at

1796. Other than refusing to quit smoking, Kevin "did pretty much whatever [Dr.

Kaufman] thought [he] ought to be doing." Id. at 1797.

After leaving the Kaufman House, he came to believe that "the whole

society we had there at Kaufman House was skewed. Arlan would sometimes talk

to us about being an elite group ahead of our time, ahead of general society as far

as our sexual mores and stuff like that and so we felt kind of pumped up like we

were leading the pack." Id. at 1809. But, he said, "now that I have been out of the

house, I f[ind] it much more desirable to fit in with the mainstream of society and

I don't think society has all the hang-ups that we were told that they had that we had to overcome by going nude and stuff like that." Id. at 1809-10.

In our view, in light of Kevin's trial testimony that the farm labor was not voluntary and his explanations for the differing account he gave to the sheriff's deputies, the jury could reasonably conclude that Kevin's later statements at trial constituted the more accurate description of the work. The fact that Linda Kaufman was present when Kevin told the deputies that he enjoyed the work further supports that conclusion. See id. at 1933 (stating that Linda Kaufman "didn't give me signals [about how to answer the deputies' questions]" but that "I knew what the right responses were . . . and I didn't want to give the wrong responses").

The Kaufmans' discussion of the ridicule that Kevin described on one occasion when he declined to work on the farm is similarly unpersuasive. We agree with the Kaufmans that such ridicule, standing alone, might not satisfy the requirement of "compulsion of services by the use or threatened use of physical or legal coercion," which the Supreme Court has deemed "a necessary incident of a condition of involuntary servitude" under § 1584. Kozminski, 487 U.S. at 48. However, the record contains ample evidence that Kevin and the other Kaufman House residents suffered far more than ridicule in the course of the Kaufmans' efforts to compel them to perform labor and services.

For example, Kevin testified that he had seen evidence that Dr. Kaufman had forcefully restrained a co-resident named Barbara after she used offensive language:

> Barb would come downstairs in tears, crying, saying how Arlan had tried to strangle her. And she would want me or other people around to look at the welts on her throat, which were usually pretty deep and like about the size of someone's finger, and the red marks around her face. And she would need sympathy and she would want empathy but it was hard to even acknowledge it publicly even among ourselves because this was our therapist, this was our landlord, this was everything else[.] [H]ow are we supposed to respond when [Dr. Kaufman] was out of control and trying to keep a person . . . shut up by holding his hands over [her] mouth and [her] throat[?].

Id. at 1687.

Moreover, Kevin testified that Dr. Kaufman told the residents that the living conditions at the Kaufman House were "the best it possibly gets and anything from here on out if we were to leave there for any reason was going down hill." Id. at 1618. As a result, Kevin feared leaving the Kaufman House, and that fear contributed to his compliance with the Kaufmans' directives:

> It's difficult to say no to someone who is your landlord, who is your therapist, who to me was, you know, a very influential person in my life. It's very difficult to say no even if the things he asks you to do are painful or illegal, as they were on occasion. I didn't wanna be kicked our of the house. I feared them. . . . I feared that.

Id. at 1798. Kevin also heard Dr. Kaufman threaten to send Barbara to a state hospital, and in light of his statements about the Kaufmans' influence, the jury could plausibly conclude that Kevin feared a similar placement if he did not comply with the various directives, including the demand for farm work.

-45-

We note that "a victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude." Kozminski, 487 U.S. at 948. Thus, "it is possible that threatening an incompetent with institutionalization . . . could constitute the threat of legal coercion that induces involuntary servitude." Id. Here, it was undisputed that Kevin suffered from a serious mental illness that made him highly susceptible to the Kaufmans' directives. In light of that evidence, a jury could reasonably find that the farm work Kevin performed was compelled "by the use or threatened use of physical or legal coercion." Id.

We therefore conclude that the evidence is sufficient to support the Kaufmans' convictions on the involuntary servitude offense alleged in Count 6 of the indictment.

## B. The Government's Appeal of Mrs. Kaufman's Sentence

We turn now to the government's appeal of Mrs. Kaufman's eighty-four month sentence on the grounds that it was both procedurally and substantively unreasonable. In our view, the government's procedural challenges are well-taken and require a remand for resentencing. Accordingly, we do not reach the issue of substantive reasonableness in this appeal.

## 1. Use of a dangerous weapon under USSG § 2H4.1(b)(2)(A)

In its first challenge, the government argues that the district court erred in refusing to follow the recommendation in the presentence report for a four-point increase in the offense level under USSG § 2H4.1(b)(2)(A) because the Kaufmans used a dangerous weapon.

Section 2H4.1(b)(2) provides:

> If (A) a dangerous weapon was used, increase by 4 levels; or (B) a dangerous weapon was brandished, or the use of a dangerous weapon was threatened, increase by 2 levels.

The accompanying commentary defines "a dangerous weapon" as:

> (I) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

USSG 1B1.1 cmt. n. 1(D).

> Under this provision, "serious bodily injury"

> means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.

USSG 1B1.1 cmt. n.1(L).

Here, in refusing to apply the four-level enhancement for the use of a dangerous weapon, the district court stated:

> [T]he device used by Arlan Kaufman (which was not admitted in evidence) has not been shown by a preponderance of the evidence to be a "dangerous weapon"

as that term is defined by USSG § 1B1.1, Application Note 1D. Therefore, defendants' objection is sustained. However, as explained later in this letter, the court may take into consideration Arlan Kaufman's use and/or threatened use of the device in determining his sentence under 18 U.S.C. § 3553.

Rec. vol. 6, doc. 342, at 1.[1]

The government now argues that the testimony was undisputed that both of the Kaufmans used the stun gun on the Kaufman House residents. It notes that Dr. Kaufman did not deny that he used the device but merely sought to minimize its effect. The government invokes cases holding that a stun gun can be considered a dangerous weapon. See United States v. Agron, 921 F.2d 25, 26 (2d Cir. 1990) (affirming a two-level enhancement for the possession of a stun gun under USSG 2D1.1(b)(1)); United States v. Wallace, 800 F.2d 1509, 1515 (9th Cir. 1986) (holding as a matter of law, a stun gun is an inherently dangerous weapon under the Federal Aviation Act of 1958, 49 U.S.C.A. § 1472(l), because it may produce great bodily harm).

Then, the government turns to the facts of this case, stating that both defendants used the stun gun against a Kaufman House resident named Peter on multiple occasions, often in front of other residents. The government also cites Peter's testimony that, on one occasion, the Kaufmans used the stun gun on his

_____

[1] Although the district court referred only to Dr. Kaufman's use of the stun gun, the parties agree that its finding that the government failed to support the enhancement applies to Mrs. Kaufman as well.

-48-

penis and testicles and that his testicles bled as a result. Rec. vol. 14, doc. 455, at 1504, 1567. Additionally, on several occasions, other residents heard Peter screaming from another room and inferred that Dr. Kaufman had used the stun gun on him.

In response, Mrs. Kaufman characterizes the court's refusal to apply the enhancement as a factual finding that we may overturn only if clearly erroneous. United States v. Townley, 472 F.3d 1267, 1275-76 (10th Cir.), cert. denied, 127 S.Ct. 3069 (2007). She then notes some gaps in the government's case: the actual device was never introduced into evidence, and the testimony regarding the stun gun came primarily from Peter, who said "yes" to the government's question whether he remembered something like a stun gun. Rec. vol. 14, doc. 455, at 1500-01. When asked to explain its effect, Peter said that it felt "horrible," "like a tight pinch," or a "hard pinch." Id. at 1505, 1567. However, the prosecution did not ask any further questions of Peter to establish the degree of pain or injury caused by the device. Finally, the resident who heard Peter screaming did not actually see Dr. Kaufman use the stun gun on him.

The application of the four-level dangerous weapon enhancement is a close question. We agree with Mrs. Kaufman that there are some factual matters pertaining to the issue that we may only review for clear error, e.g., whether the stun gun was capable of inflicting serious injury and whether the Kaufmans actually used it or threatened to use it. Nevertheless, we agree with the

government that there is evidence in the record supporting its contention that the stun gun was such a weapon and that the Kaufmans used it and threatened to use it (e.g., Peter's testimony that the Kaufmans shot his penis and testicles until he bled and other residents' testimony that they hear Peter screaming shortly after Dr. Kaufman had displayed the stun gun).

Nevertheless, the district court's general finding—that the stun gun "has not been shown by a preponderance of the evidence to be a 'dangerous weapon' as that term is defined by USSG § 1B1.1"— is insufficient to allow meaningful appellate review. We cannot tell from that statement whether the court concluded that the stun gun was not capable of causing serious bodily injury, that it was not actually used by the Kaufmans in the manner that Peter described, that the injuries were not as serious as Peter maintained, or whether there was some other reason for the court's refusal to apply the enhancement. Thus, our "appellate review of the propriety of applying this serious enhancement is hindered by the absence of a clear picture of the reasoning employed by the sentencing court." United States v. Torres, 53 F.3d 1129, 1143 (10th Cir. 1995).

Accordingly, we must remand the case to the district court for particularized findings on this issue. See United States v. Pelliere, 57 F.3d 936, 940 (10th Cir. 1995) (remanding for resentencing because the district court "articulated no specific findings to support its decision" that an enhancement was proper). On remand, the district court should address the questions of whether the stun gun was

-50-

capable of inflicting serious bodily injury and whether the defendant Linda

Kaufman used it, threatened to use it, or aided and abetted in its use. The court

should also explain the evidence on which it relies in reaching those conclusions.

## 2. Committing offenses that involved a large number of vulnerable victims under USSG § 3A1.1

The government contends that the district court erred in refusing to impose a

two-level enhancement under USSG § 3A1.1 because the offenses involved a large

number of vulnerable victims. The relevant portion of Section 3A1.1 provides:

> If (A) [the defendant knew or should have known that the victim was vulnerable] and (B) the offense involved <u>a large number of vulnerable victims</u>, increase the offense level . . . by 2 additional levels.

USSG § 3A1.1(b)(2) (emphasis added).

The district court expressly decided not to resolve this issue:

> The jury determined that both defendants knew or should have known that the victims were "vulnerable" as that term is defined in USSG § 3A1.1(b) and Application Note 2. However, the guideline does not define "large number" or any number, even though the Sentencing Commission, in its infinite wisdom has seen fit to do so in other advisory guideline sections. Nor has the Tenth Circuit. The court sees no useful value in applying the enhancement, thereby creating an unnecessary appellate issue. According[ly] defendants' objection is sustained for the purpose of the advisory sentencing guidelines. However, I may consider the number of victims for the purpose of determining sentences under § 3553.

Rec. vol. 6, doc. 342, at 1.

Nevertheless, the government has decided to make this an appellate issue. While acknowledging that the guidelines do not define what constitutes a "large number" of vulnerable victims, it maintains that the enhancement is appropriate here. In its view, more than twenty vulnerable victims suffered from the Kaufmans' crimes, and twelve of those victims were required to disrobe and engage in sexual acts.

We agree with the Eighth Circuit that the term "large number" as used in USSG § 3A1.1(b)(2) is "largely uninterpreted." United States v. Anderson, 349 F.3d 568, 573 (8th Cir. 2003). Neither the parties nor the district court have cited any cases that explain the term or offer any general criteria for determining whether the number of victims was "large."[2]

---

[2]  In United States v. Caballero, 277 F.3d 1235 (10th Cir. 2002), the district court did apply the "large number" enhancement. The defendants were convicted on a variety of conspiracy and mail fraud charges involving their scheme to defraud immigrants seeking to obtain legal residence in the United States. At sentencing, the district court applied the two-level enhancement for vulnerable victims and then applied the additional two-level enhancement at issue here (for a large number of vulnerable victims).

In their appeal, the Caballeros did not directly challenge the "large number" determination. They did challenge the district court's finding that the immigrant victims were vulnerable, and we affirmed that finding. Nevertheless, there is some discussion of the number of victims in Caballero. "[T]he government presented evidence from sixteen victim-witnesses at the Caballeros' trial." Id. at 1251. Apparently, the district court and the parties agreed that sixteen was enough to be "a large number."

-52-

However, we agree with the government that another section of the Guidelines supports its position that the offenses involved a "large number" of vulnerable victims. Commentary accompanying USSG § 2H4.1, which concerns involuntary servitude offenses, states that "[i]f the offense involved the holding of more than ten victims in a condition of peonage or involuntary servitude, an upward departure may be warranted." USSG § 2H4.1 cmt. n.3. That commentary suggests that in the context of involuntary servitude and forced labor, ten victims is a large number. We see no reason not to apply that same standard to the "large number" inquiry under USSG § 3A1.1(b)(2) when, as here, the offenses include involuntary servitude convictions.

However, "[i]n order to classify a victim as 'vulnerable,' the sentencing court must make particularized findings of vulnerability. The focus of the inquiry must be on the victim's personal or individual vulnerability." United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995) (internal quotation marks omitted); see also United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002) ("Membership in a class of individuals considered more vulnerable than the average individual is insufficient standing alone [to qualify as a vulnerable victim]."). Here, the district court made no such findings.

Accordingly, as to this potential enhancement as well, we must remand the case to the district court for additional findings. On remand, the district court should determine individually which of the Kaufman House residents were

vulnerable victims. We note that under the commentary to USSG § 3A1.1, a vulnerable victim is one "(A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under 1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." USSG § 3A1.1 cmt. n.2. In determining whether there was a "large number" of vulnerable victims, the district court should use the figure set forth in the commentary accompanying § 2H1.4: in these circumstances, more than ten vulnerable victims is a large number under USSG § 3A1.1(b)(2).

### 3. Obstruction of justice under USSG § 3C1.1

Finally, the government argues that the district court erred in refusing to apply the obstruction of justice enhancement under USSG § 3C1.1. That section states:

> 3C1.1. Obstructing or Impeding the Administration of Justice
>
> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

At sentencing, the district court imposed an obstruction of justice enhancement upon Dr. Kaufman based upon his perjured testimony at trial.

However, as to Mrs. Kaufman, the court stated that the government's proof was "not sufficient to convince [the court] that Mrs. Kaufman attempted to obstruct justice." Rec. vol. 22, doc. 482, at 12.

In challenging this ruling, the government notes that Mrs. Kaufman was convicted of count 33 of the indictment, which alleges that she obstructed a federal audit (of Medicaid billing), in violation of 18 U.S.C. § 1516. In the government's view, her conviction on Count 33 alone was sufficient to compel the application of this enhancement. In response to the government's argument, Mrs. Kaufman does not challenge the failure to apply the obstruction of justice enhancement. Instead, she merely argues that any error was harmless.

On this issue, we also agree with the government. In contrast to the other sentencing issues we have addressed, no additional factual findings are necessary to support the enhancement. As the government notes, the commentary accompanying USSG § 3C1.1 states that convictions under the obstruction of justice statutes in Title 18 of the criminal code are sufficient to support the enhancement. See USSG § 3C1.1 cmt. n.4 (stating that "[t]he following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies: . . . other conduct prohibited by obstruction of justice provisions under Title 18, United States Code"). Mrs. Kaufman's conviction of obstructing a federal audit, as charged in count 33, is sufficient to support the enhancement.

Thus, in making the Guidelines calculation on remand, the district court should include the two-level enhancement for obstruction of justice under USSG § 3C1.1.

### 4.  Remand for Resentencing

In light of the district court's procedural errors we must vacate Mrs. Kaufman's sentence unless those errors were harmless.  See United States v. Conlan, 500 F.3d 1167, 1169-70 (10th Cir. 2007).  In this context, "[h]armless error is that which did not affect the district court's selection of the sentence imposed," and "[t]he burden of proving harmlessness is on the beneficiary of the error"—here, Mrs. Kaufman.  United States v. Montgomery, 439 F.3d 1260, 1263 (10th Cir. 2006) (internal quotations omitted).

On this record, we cannot say that the district court's procedural errors were harmless.  Those errors may have resulted in as much as an eight-level difference in Mrs. Kaufman's offense level, potentially increasing the advisory Guideline range from the 135-168 month range used by the district court to a range as high as 324-405 months (if the district court had applied the three enhancements that the government now urges).  In light of this substantial difference in the advisory range, Mrs. Kaufman has failed to establish that the district court's errors did not affect the sentence imposed.  As noted earlier, "[b]ecause we are reversing [Mrs. Kaufman's] sentence based on the procedural error[s], we do not address [her] substantive challenges to [her] sentence."  Conlan, 500 F.3d at 1169 n*.  Accordingly, we must remand the case for resentencing.

### 5.  Notice of Intent to Vary

One final point.  Both the government and Mrs. Kaufman also argue that the district court erred in failing to provide them with advanced notice of its intent to downwardly vary from the Guideline sentencing range in light of the sentencing factors set forth in 18 U.S.C. § 3553.  The parties cite our decision in United States v. Atencio, 476 F.3d 1099 (10th Cir. 2007).  There, we held that "Rule 32(h) [of the Federal Rules of Criminal Procedure] applies to variances as well as to departures, requiring courts to give advance notice of their intent to sentence above or below the identified advisory Guidelines range." 476 F.3d at 1104.

In a recent decision, the Supreme Court has disagreed with that holding, concluding that the Rule 32 notice requirement does not apply to variances. Irizarry v. United States, 128 S.Ct. 2198, 2203-04 (2008).  Thus, Atencio has been overruled on that issue, and the district court's alleged failure to provide advance notice of the grounds on which it was contemplating a variance was not error.

### III.  CONCLUSION

We therefore AFFIRM Arlan and Linda Kaufman's convictions.  We VACATE Linda Kaufman's sentence and REMAND for resentencing consistent with this opinion.