Filed 2/24/14  P. v. Smith CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055780 |
| v. | (Super.Ct.Nos. RIF144557 & 144586) |
| DANIEL LEE SMITH, | |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of Riverside County.  Ronald L. Johnson, Judge.  (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Julie Schumer and Patrick Clancy for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Daniel Lee Smith appeals from his conviction of eight counts of child molestation (Pen. Code, § 288, subd. (a)) and one count of evading a police officer (Veh. Code, § 2800.1(a)), with true findings on a multiple victim enhancement allegation (Pen. Code, § 667.61, subd. (e)(5)) and a prior strike allegation (Pen. Code, §§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1).).[1]

Defendant contends: (1) the trial court's order precluding him from having eye contact with two of the victims during their testimony deprived him of his constitutional rights to confrontation and a fair trial, or, in the alternative, he was deprived of effective assistance of counsel in this regard; (2) the admission of evidence of uncharged sexual offenses under Evidence Code section 1108 deprived him of due process; (3) evidence of the uncharged sexual offenses should have been excluded under Evidence Code section 352; (4) the trial court erred in denying his motion for mistrial after a witness testified defendant "had been found guilty" in dependency court, or, in the alternative, defendant was deprived of effective assistance of counsel in this regard; (5) the trial court erred in allowing a prosecution witness to testify as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS) because it deprived him of his right to notice and exceeded the witness's expertise, or, in the alternative, he was denied effective assistance of counsel in this regard; (6) the trial court erred in admitting evidence of the number of Child Protective Services (CPS) contacts with defendant's household in the year before

---

[1] Defendant has also filed a petition for writ of habeas corpus (case No. E058032). We deny that petition in a separate order.

his arrest; (7) the prosecutor committed error during cross-examination of the mother of the victims and during argument to the jury, or, in the alternative, defendant was denied effective assistance of counsel in this regard; and (8} the cumulative error doctrine requires reversal. We find no prejudicial error, and we affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. Jane Doe 1's Testimony

Jane Doe 1, the victim of counts 3 through 5, was 17 years old at the time of trial. When she was six years old, defendant moved in with Doe 1, her mother, and her younger sister, Jane Doe 2. Doe 1 called defendant "dad" and loved him like a father.

Defendant began molesting Doe 1 when she was six years old by touching her vaginal area when she was in bed. Doe 1 slept in the lower bunk in a bedroom she shared with Doe 2, who slept in the top bunk. Sometimes the molestation occurred when defendant put Doe 1 to bed; other times, he entered the room later. Doe 1 did not remember how many times it happened, but it seemed like it was "almost every night." At first, defendant rubbed around outside Doe 1's vagina, but later, he took her underwear off and touched inside her vagina about five times. It hurt, but she did not tell him to stop. When Doe 1 was in fourth through sixth grade, defendant orally copulated her about 15 times after removing her underwear. The acts occurred while Doe 2 was asleep in the top bunk.

Doe 1 told her mother about the touching, and as she got older, she brought up the subject when arguing with her mother because she felt her mother was not protecting her.

3

She believed Doe 2 had heard the arguments, but Doe 1 did not think she had told Doe 2 directly about the abuse.

The family lived in Orange County until Doe 1 was 12, and Doe 1 was friends with Natalie M., who lived in their apartment complex. Doe 1 told Natalie M. that defendant had molested her.

Doe 1 talked to a CPS worker when she was between six and 10 years old. The worker asked if anyone had tried to touch her private parts, but Doe 1 did not tell about the abuse. Doe 1 did not remember talking to a social worker on a second occasion in 2007 and telling the worker that nothing had happened.

The molestations of Doe 1 stopped when the family moved to Corona. Doe 1 and Doe 2 no longer shared a room. They had a new half sister, Jane Doe 3. After the family moved to Corona, Doe 1 had heated arguments with her mother during which they fought physically.

When Doe 1 was 12, she met J.B. at school, and they began dating when she was 13. After six months, J.B. guessed that Doe 1 had been molested, and she confirmed to him that she had been. Defendant and Doe 1's mother approved of J.B. and got along with him. She was not allowed to talk to him when she was grounded or got bad grades, but she would then sneak phone calls with him. She denied her parents had told her she could not be with him unsupervised.

Once, Doe 1 had a conversation with Doe 2 about why Doe 1 made such a big deal out of everything with their parents. Doe 1 brought up the abuse, and Doe 2 said defendant had French kissed her. Doe 1 was angry and asked Doe 2 if anything had

4

happened, but Doe 2 "clammed up" and did not disclose anything else. Doe 1 raised the subject later, and Doe 2 told her to "leave it alone." Doe 1 eventually told her counselor and the police what Doe 2 had said.

On the weekend of June 21, 2008, Doe 1 got into a day-long fight with her parents because they refused to allow her to go to a friend's party. They said they were kicking her out, and she started packing, but they then yelled at her and told her not to. Defendant tried to drag her to her room, which caused rug burns on her elbows, and he grabbed her by the hair and hit her on the side of her head. Photographs of Doe 1's elbow were admitted into evidence. Her mother threw her shoe in the toilet so she could not leave. Doe 1 left through the window and went to the friend's house where she had previously been forbidden to go. After two days, she returned home to find all her belongings in a trash can. At school, she was pulled out of her class by a counselor. She told the counselor she had been molested, and she disclosed the molestation to a police officer out of concern for her little sisters. She did not return home, but was placed in foster care.

Detective Damon Devine interviewed Doe 1 on July 7, 2008. Doe 1 denied that her mother had tried to control her or had given her a hard time about contacting the police. She told the detective that Doe 2 was still denying being abused. She believed Doe 2 would say anything to get out of foster care.

At Detective Devine's request, Doe 1 surreptitiously recorded a conversation with Doe 2. Doe 1 testified that Doe 2 confirmed abuse but did not give many specifics. Doe 2 denied being French kissed by defendant but admitted "'just a really long, regular kiss,

5

not even really long.'" Doe 1 helped Doe 2 write something about the abuse while in foster care; Doe 1 did not tell Doe 2 what to say but helped her with wording and spelling and told her to be more specific. She never told Doe 2 to lie or to exaggerate. She denied writing the document herself.

### B. Doe 2's Testimony

Doe 2, the victim of counts 6 through 10, was 14 at the time of the trial. She called defendant "Dad" and saw him as a father figure. When she was eight or nine years old, the family was living in Anaheim. Defendant French kissed her, which she described as "[o]pen mouth with tongue," when he said good night. She saw defendant lean into Doe 1's bottom bunk, but she did not remember ever seeing defendant put his hands on Doe 1's private parts. When Doe 2 was 10 or 11, she heard Doe 1 and their mother at least five times talking about defendant touching Doe 1.

The family moved to Corona when Doe 2 was eight and a half or nine, and she then shared a bedroom with Doe 3 instead of Doe 1. Defendant began touching her vaginal area both over and under her clothing almost every night while she was in bed. She felt scared and helpless, and she sometimes pushed him away and told him no. Defendant then kept going and told her it was okay and it was supposed to be happening. Defendant put his finger inside her vagina, and it hurt.

Doe 2 did not remember telling her mother about the abuse until she was in foster care. Her mother "called [her] a liar, and she freaked out and started bawling and told [Doe 2] that she didn't believe [her]. And [Doe 2] kept talking to her about it, and by the end she said that maybe she did believe [her]." The mother told Doe 2 not to tell the

6

police or CPS anything. Doe 2 did not say anything to CPS for months because she wanted the family to get back together. Doe 2 did not remember whether she had told Doe 1 about defendant's French kissing her. After they were placed in foster care, Doe 2 was really angry at Doe 1 because she did not want the family to break apart. She was no longer angry at Doe 1.

When Doe 2 first disclosed the abuse, she wrote it in a notebook and gave it to the interviewer at Doe 1's suggestion. Doe 1 was present when Doe 2 wrote her statement, and Doe 1 checked the statement and made suggestions. Doe 2 confirmed that her disclosures in the statement about defendant French kissing her and touching her breasts and vagina were true.

At the time of trial, Doe 2 was living with her biological father in another state. She and Doe 1 communicated through texts and Facebook about every week, but they only visited each other once or twice a year. They were "kind of like best friends now." Doe 1 had not pressured Doe 2 to testify to anything or to say anything untrue, and Doe 2 would not do so even if asked. She conceded she had lied at least 12 different times to law enforcement. She had lied because her mother had told her not to say anything.

### C. Doe 3's Testimony

Jane Doe 3 was six years old at time of trial. She testified that defendant had touched her "pee pee" "[a] lot" when she was in her bed sleeping. That had happened "a long time ago" when she shared a bedroom and bed with Doe 2. When defendant touched her, it made her feel scared, and she did not like it. She did not know if it had been a dream, and she had not asked him to stop because she "was asleep." She had

7

talked about the touching "a lot" and "[m]aybe more than ten times" with her foster mother. She was mad at defendant for what he had done. She did not remember telling anyone when she was three years old that no one had ever touched her body. She said she still told lies sometimes.

Transcripts of Doe 3's Riverside Child Assessment Team (RCAT) interviews were provided to the jury. In the first interview, Doe 3 denied that anything had happened to her on her body or to her sister. In the second interview, Doe 3 said she did not think anything had happened to her in any part of her body, including her private spot and her bottom. If something happened, she would say, "[N]o, don't do that!" and she would tell someone she trusted. She said she used to live with her "real daddy"; he was nice, and she was not scared of anything or anyone.

### D. Other Prosecution Evidence

#### 1. Tami V.

Doe 3's foster mother, Tami V., testified that Doe 3 had lived with her since May 2009. Doe 3 had extensive eczema that "comes and goes mostly under stress." Doe 3 scratched herself, mostly when she went to bed, and picked at her skin, which inflamed the eczema. Doe 3 became anxious before visits with defendant. After the visits ceased in March 2010, Doe 3's behavior improved. Tami V. noticed unusual behavior in Doe 3, including sleeping with her clothes removed from the waist down and masturbating in front of Tami V. while taking a bath. Doe 3 never had eczema around her vagina. Doe 3 told Tami V. that when she was rubbing herself, she thought about "'little boys touching me and then touching themselves, and it ma[de her] feel like the food in [her] stomach

8

[was] fighting.'" Tami V. had seen Doe 3 "humping on a stuffed animal," looking at herself in the mirror with her legs spread, rubbing herself on Tami V.'s leg, and humping a chair leg, among other things. Tami V. talked to her about keeping her private parts covered and not touching anyone else or showing her body. When she visited her sister, she would say, "'Well none of my family likes [Doe 1]. [Doe 1] lied.'" Doe 3 had been in therapy since she was placed with Tami V. Doe 3 told Tami V. that "she would lay [*sic*] in bed at night and feel sick, feel gross because she would think about men touching her." At first, Doe 3 denied that anyone had done anything to her, but after visits with defendant were terminated, she said she had not slept well. Tami V. testified: "I said, 'Why not?' She goes, 'You know how I think about men touching me? I kept having those thoughts last night, and I felt yucky.' At that point, that's the first time she was doing this. She kept saying, 'Maybe it was a dream, maybe it wasn't. Maybe it was a dream, maybe it wasn't." She later said (to Tami V.): "'I need to tell you something. I think it was my dad who touched me.'" She repeated that conversation about five times. When Tami V. asked how she knew it was her dad, she said, "Because I went like this, and I opened my eyes, and I saw him walk out of the room."

Tami V. testified that she wanted to adopt Doe 3, and the adoption would finalize the next month. Doe 3 had not lived with Doe 1 or Doe 2 since she was three years old.

### 2. *Dr. Susan Horowitz*

Dr. Susan Horowitz testified that she had examined Doe 3 in October 2009 for sexual abuse. In her report, she noted "'abnormal anal/genital' exam" because Doe 3 had extensive labial fusion that could be caused by sexual abuse or other mechanisms. She

9

did not see eczema in Doe 3's vaginal area. She also checked a box on the report that stated "'limited insufficient history'" because Doe 3 had not disclosed abuse. Dr. Horowitz testified that Doe 3's "sexualized behavior is . . . consistent with a history of being sexually abused." Dr. Horowitz also testified Doe 3 had denied being abused. On cross-examination, she testified that labial fusion is common in young girls, and she could not say it was caused by sexual abuse; it could have been congenital or it could have been caused by rubbing.

### 3. Natalie M.

Natalie M. testified that she had been 11 years old when she met Doe 1; Doe 1 was then about eight. They lived in the same apartment building, and for several years, Natalie M., Doe 1, and Doe 2 saw each other daily, and they were very close. When Doe 1 was about 11, she told Natalie M. a secret of a sexual nature, specifically, that defendant touched her "[d]own where she goes to the bathroom." Natalie M. told Doe 1 she should tell her mother, and Doe 1 said she had already done so, but her mother did not do anything.[2] Natalie M. did not tell anyone of Doe 1's disclosure.

---

[2] Before Natalie M. testified in front of the jury, she testified at an Evidence Code section 1360 hearing that Doe 1 had told her that defendant had touched her. She testified she did not remember any more specifics about what Doe 1 had said about the touching or its frequency. On cross-examination, she confirmed that "[o]ther than saying, '[Defendant] touched me' or 'Dad touched me,' that's the extent of what [she] recall[ed] [Doe 1] telling [her]." Natalie M. agreed with the prosecutor's question on direct examination that Doe 1 had disclosed a "secret of a sexual nature," specifically that defendant had touched her and that Doe 1 had said defendant had touched her "[d]own where she goes to the bathroom." On cross-examination, Natalie M. testified she had never before told anyone that Doe 1 had said she was touched "down there."

## 4. Sheri McCluskey

Sheri McCluskey, an Orange County CPS employee, testified that in February 2002, an anonymous report of sexual abuse and general neglect in defendant's household had been received. McCluskey interviewed Does 1 and 2, then eight and five years old respectively, and both denied sexual abuse. McCluskey testified it was not uncommon for a child to deny abuse. The investigation was deemed inconclusive. Doe 2 told McCluskey that her mother had also asked her whether defendant had touched her because he had touched Doe 1.

## 5. Deputy Jeremy Dortch

Riverside County Deputy Sheriff Jeremy Dortch testified he was dispatched to defendant's house at about 4:00 p.m. on July 9, 2008. He and his partner knocked on the front door, but there was no response. They continued to knock on the door and rang the doorbell for five minutes to 10 minutes. They then drove down the street out of sight of the house and parked. At about 7:00 p.m., they saw a car pass by. It was the same color, year and make, and license tag as the car that had been parked in defendant's driveway; a man was driving, and a woman was the passenger. The deputy attempted to pull the car over after seeing it run three stop signs, fail to yield, and change lanes without signaling. The car entered a freeway, and the deputy turned the pursuit over to the California Highway Patrol. After defendant was pulled over, he told Deputy Dortch that he did not pull over earlier because he believed he was going to be arrested on an open child molestation case. The woman passenger, defendant's wife, was crying and upset. She

11

said she had wanted to get out of the car many times during the pursuit, and she had actually tried to do so. Defendant had screamed at her to stop and sped up.

### E. Defense Evidence

#### 1. *Tricia Hoyle*

Tricia Hoyle, a supervisor at Riverside County CPS, testified that in July 2008, she learned that Doe 1's boyfriend had come for a visit at Doe 1's foster home. Hoyle had spoken to Doe 1 and told her there would be no more contact with her boyfriend. Doe 1 denied that he was her boyfriend and said he was her best friend, but she admitted they had kissed. Hoyle said she might consider phone calls between the two. Hoyle had information that Doe 1 and her boyfriend had been discussing ways to kill defendant. Hoyle told Doe 1's primary social worker that the calls had to be monitored and timed.

#### 2. *Sean W.*

Sean W., defendant's cousin and a police officer in Orange County, testified that defendant had been involved in property crimes and drug use from his late teens through his 30's, but in the last 10 years, his character had changed, and defendant had been clean and sober. Sean and his wife had been foster parents for Doe 3 from about August 2008 until May 2009. Sean had seen once Doe 3 masturbating, and he reported it to the social worker. Sean did not believe defendant had molested the girls. However, Sean had never visited defendant's home and had never met Doe 1. While she lived in his home, Doe 3 never mentioned being molested.

12

### 3. Mindi W.

Mindi W., Sean's wife, testified that she never observed any hypersexual behaviors on the part of Doe 3. Doe 3 had scratched her inner thighs because of her eczema, but she was not touching herself sexually. Doe 3 frequently took off her pajamas and underwear at night because she said her eczema itched. Doe 3 told Mindi that no one had touched her private area. Mindi testified that she would find it unusual for a five-year-old child to "hump" stuffed animals and chair legs and to have nightmares about men touching her; however, she had never observed such behaviors when Doe 3 was living with her.

### 4. T.S.

Defendant's wife, T.S., testified they had been together 12 years. Doe 1 had never reported being sexually abused by defendant. After the 2002 CPS interviews, T.S. talked to Does 1 and 2, and both denied being touched. She believed Doe 1 and Doe 2 were lying about the abuse. The girls again denied abuse during the CPS investigation in 2007. T.S. never told the girls to lie to CPS and the police.

Starting in about June 2007, Doe 1 began to obsess about J.B., and she became unattached from the family. Doe 1 got into arguments and physical fights with T.S., including fights about Doe 1 wanting to get "on the pill." Doe 1 ran away "out the window" in March 2008 and went to the house of a friend she had been forbidden to visit. Defendant went there to pick her up. Doe 1 was late coming home from school one day in April 2008, and again defendant found her and brought her home.

13

In June 2008, Doe 1 begged to be allowed to go to a party at her friend's house, but T.S. refused permission. On the day of the party, defendant told Does 1 and 2 to clean the backyard. Doe 2 came inside crying and said Doe 1 had punched her five times on the head. T.S. heard what sounded like a loud slap and went to Doe 1's room. Doe 1 was sitting on the bed crying and holding her ear and arguing with defendant. Doe 1 accused defendant of making her deaf in her ear, and she "looked up at him and said, 'I will do whatever I can to send you to prison for the rest of your life.'" T.S. left the room and she saw Doe 1 "[s]torming towards the front door." Defendant came out and grabbed Doe 1, who "threw herself to the ground and turned around and started kicking him." She fought and yelled while defendant pulled her to the bedroom. Defendant told her to stay in her room and closed the door. When he checked on her 10 minutes later, she was gone; the window was open and the screen was removed.

T.S. confirmed that Doe 1 had gone to the party so she did not report Doe 1 missing. Doe 1 called the next day, and T.S. told her that if she returned home she would have to live by her parents' rules. Late Monday afternoon, CPS workers came to the house. Defendant told them they could not come in without a warrant, but he eventually opened the door to them.

T.S. denied that Doe 1 had packed her suitcases. She admitted that on a previous occasion she had thrown one of Doe 1's shoes in the toilet to prevent Doe 1 from running away. T.S. denied that Doe 1's belongings had been put in the trash.

On July 9, 2008, the day defendant was arrested, T.S. had visitation with Doe 2 and Doe 3. Doe 2 said she was sorry and that the foster parents had told her if her story

14

did not match Doe 1's, "then she would never see her parents again," but if her story did match, "we would all go to family counseling, and we would be able to come home." Doe 2 said she had told the social workers "'it happened to [her] too.'" T.S. went home and told defendant what had happened at the visit. Later that evening, they left the house to go to defendant's mother's house. T.S. saw police lights behind them, and she asked defendant to pull over. She did not try to get out of the car. Defendant was not speeding during the pursuit.

In 2002, a CPS worker asked Doe 2 if she knew anything about Doe 1 being abused. Doe 2 responded, "'Well, I knew—I think I knew it happened to [Doe 1].'" T.S. testified she and defendant went together into the girls' room to kiss them good night. She did not think he went in without her.

### 5. *Lisa Austin*

Lisa Austin, a CPS employee, testified that a 2007 referral was deemed unfounded. Doe 1 had said her family was very close, there was no drug or alcohol use in the home, and although her parents argued, she had never seen them hit each other. She stated no one had touched her private areas.

### 6. *Defendant's Testimony*

Defendant testified on his own behalf. He denied that he had ever molested Doe 1, 2, or 3, or had ever French kissed Doe 2.

On Saturday, June 21, 2008, there had been a big blowup with Doe 1 because they denied her permission to go to a party at her friend Jackie's house. A few months earlier,

15

defendant had gone to Jackie's house and had found Doe 1 and J.B. in a tree house there. Doe 1 was on her back, and J.B. was on top of her; they were kissing.

The first time Doe 1 ran away, defendant went to Jackie's house to pick her up. No one came out, but a large dog came toward the car "in attack mode." Defendant got a crowbar out of the trunk to protect himself, but he did not swing it because Doe 1 came out to the car. He did not try to kill the dog.

Doe 1 was obsessed with J.B. She talked about him all the time, and her grades started dropping. She became more disrespectful to defendant and her mother. On June 21, defendant told Doe 1 and Doe 2 to clean up the yard and play with their dog. Doe 2 came in crying, saying that Doe 1 had hit her five times in the face. Defendant went outside, and Doe 1 said she had hit her sister because "she felt like it." Defendant sent her to her room, and he started pulling out the cords for her television and stereo. Defendant and Doe 1 called each other "bitch," and defendant slapped her on the cheek. Doe 1 fell to the floor and said she was going to call social services. She said she was deaf in her ear, and she said, "'I'm going to do whatever I can to send your fucking ass to prison for the rest of your life.'" Defendant left the room. A few minutes later, Doe 1 walked to the front door to leave the house, and defendant jumped up and grabbed the back of her shirt to stop her. She fell down and started kicking him. He grabbed her ankles and took her back to her room. He looked in her room a few minutes later, and she was gone. He drove up and down the street but could not find her. T.S. called Jackie's house and learned that Doe 1 had gone to the party. He spoke to Doe 1 and told her they wanted her to come home, but she did not.

16

Defendant testified he and T.S. had not kicked Doe 1 out of the house that day. She was not packing a suitcase. He did not see T.S. throw Doe 1's shoe into the toilet. They did not put Doe 1's things outside by the curb.

On June 23, Monday, police officers came to the house. He was in the bathroom and did not answer the door for a few minutes.

### 7. *James Blanco*

James Blanco, a forensic document examiner testified he had examined various writings by Does 1 and 2 and, in his opinion, Doe 1 wrote the notes that Doe 2 claimed to have written.

### 8. *Detective Devine*

Detective Devine testified that he interviewed Doe 1 three times in June and July 2008. She never told him she had been kicked out of her house, that she had gone to school Monday morning after staying away all weekend, that her clothes had been placed in the trash, or that her mother had thrown her shoe in the toilet.

In the first interview, Doe 1 told him that whether it was better to tell the truth or to lie depended on the situation. She said her parents were mad because she hit her sister and talked back, after which defendant slapped her. She had run away before, but she did not remember why. She felt safe at home.

In the second interview, Doe 1 said that Doe 2 had never admitted anything other than defendant had French kissed her; Doe 1 said that Doe 2 just wanted to go home and was just saying anything to get out of foster care.

17

In the third interview, Doe 1's foster mother gave the detective a poem that Doe 1 said she had written with a friend.

Detective Devine interviewed Doe 2 twice. In the first interview, she denied that defendant had French kissed her; rather, he had just given her a longer kiss when saying good night. She did not fear him, and she did not think he would hurt her. She said her memories went back no further than the current year (2008). She felt safe at home; both parents had good qualities; the only thing she would change about defendant was that he worked too hard. Doe 2 told the detective that Doe 1 had run away at least five times. She repeated that she was telling the truth. If defendant had touched her, she would tell a close friend or Doe 1.

In the second interview, Doe 2 denied that she felt intimidated. She said that all Doe 1 cared about was her friends and boyfriend. In her RCAT interview, Doe 2 had denied being molested. Devine told Doe 2 that "contradicting everything [Doe 1] said" would not get her home sooner, and the process would speed up if she stopped contradicting Doe 1. Doe 2 continued to deny being molested, but the detective thought she was lying. Doe 2 never told Detective Devine that her mother had told her to deny being molested.

Detective Devine set up a second RCAT interview for Doe 2, which he watched from a separate room. Doe 2 handed the RCAT interviewer a diary[3] and said, "'I don't

---

[3] Only pages from the diary were introduced into evidence. Detective Devine testified he obtained the diary from the RCAT interviewer and booked it into evidence. He did not know where the remainder of the diary currently was. It was stipulated that Doe 2 had given the RCAT interviewer the diary book during an interview. The

*[footnote continued on next page]*

want to answer any questions. It's all right here.'" She said her handwriting had changed and she did not want the interviewer to think anyone else had signed the book for her. When the interviewer asked her specific questions, she said she did not remember despite the statements in her diary.

Eventually, Doe 2 told the RCAT interviewer that defendant laid her down on her bed and mattress in the family room and rubbed her stomach down to her genital area on top of an underneath her clothes. He sometimes put his finger in her vagina, touched her breasts, and pressed his penis against her buttocks. He also French kissed her twice.

**F. Verdicts and Sentence**

The jury found defendant guilty of eight counts of child molestation (Pen. Code, § 288, subd. (a)) and one count of evading a police officer (Veh. Code, § 2800.1(a)) and found true a multiple victim enhancement allegation (Pen. Code, § 667.61, subd. (e)(5).) The trial court found true a prior strike allegation (Pen. Code, §§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)).) The trial court sentenced defendant to a total term of 70 years to life plus a concurrent term of 180 days for count 2.

### III. DISCUSSION

**A. Order Precluding Eye Contact with Victims**

Defendant contends the trial court's order precluding him from having eye contact with Does 2 and 3 during their testimony deprived him of his constitutional rights to confrontation and a fair trial, or, in the alternative, he was deprived of effective assistance

---

*[footnote continued from previous page]*
interviewer's practice was to give such an item to law enforcement, and she believed she had done so in this case. She did not have the book.

19

of counsel because his trial counsel did not raise an objection on constitutional due process grounds.

### 1. *Additional Background*

The prosecutor requested before trial that defendant's seat be moved farther from the witness stand during the testimony of Does 2 and 3, who were then 14 and six years old, respectively. The prosecutor suggested that defendant sit to defense counsel's right rather than left. The court stated defendant could remain where he was, but other arrangements would be made "if there is any visual contact between the defendant and the witness when she is testifying . . . ." The court clarified, "There can't be any kind of stare down or any kind of effort to intimidate or influence. I'm sure [defendant] understands that he is going to have [to] keep his eyes on me or forward when the witness testifies."

Defense counsel inquired, "He can't look at the witness?" The court responded, "I don't want any visual contact between he [*sic*] and witness, especially with the seven year old. That is just too—there is too much possibility that it will influence the testimony in some fashion." Defense counsel objected that the jury might infer defendant's guilt from his failure to look at the witnesses and that she relied on her clients to note their observations. The trial court disagreed and offered to explain its order to the jury, but defense counsel declined.

The trial court stated that although defendant had a right to face his accuser, "he doesn't get an opportunity to intimidate." The court later clarified its order: "[I]t does not have to be like blinders [or] staring straight at me. What I want to avoid is any

20

intense eye contact so that there is no perception on their part or your part or my part or anybody's part that in any way their testimony is being influenced." The court continued, "It's not to not allow you to confront your witnesses, because you are entitled to do that, but because of their ages, I think it's important. We can send signals unintentionally, even to our children. My mother could give me a dirty look that would stunt my growth. She didn't have to say word one. And children are very perceptive of those kinds of visual contact and visual communication. I want to make sure that that does not occur in this case. If you will just honor that, I would appreciate it." Defense counsel again objected.

### 2. *Standard of Review*

We apply the deferential abuse of discretion standard to review a trial court's order concerning alternate procedures for witness testimony. (See *People v. Lujan* (2012) 211 Cal.App.4th 1499, 1507.)

### 3. *Analysis*

In *People v. Herrera* (2010) 49 Cal.4th 613, the court explained the purpose of the Confrontation Clause: "The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.'" [Citation.] To deny or significantly diminish this right deprives a defendant of the essential means of

21

testing the credibility of the prosecution's witnesses, thus calling "into question the ultimate '"integrity of the fact-finding process."'" [Citation.]' [Citation.]" (*Herrera*, *supra*, at pp. 620-621.)

As a general rule, a criminal defendant is entitled under the Confrontation Clause to a "face-to-face meeting with witnesses appearing before the trier of fact." (*Coy v. Iowa* (1988) 487 U.S. 1012, 1015-1016 (*Coy*) [holding that the defendant was deprived of his right to confront the witnesses against him when the witnesses testified behind a screen, though which the defendant could "dimly" perceive the witnesses, but they could not see the defendant].) The Supreme Court also recognized that the general rule is not absolute, and alternate procedures are permissible when necessary to further an important public policy. (*Coy*, *supra*, at pp. 1020-1021.) Thus, in *Maryland v. Craig* (1990) 497 U.S. 836 (*Craig*), the Court upheld a state statute that permitted child abuse victims to testify outside the courtroom over one-way, closed-circuit television when a showing was made that face-to-face testimony would be traumatic to the child. The Court held that protecting the minor victim from further trauma was a compelling state interest. (*Id.* at p. 852.)

Unlike in *Coy* and *Craig*, the instant case does not involve the physical separation of the witness from the defendant and/or the jury. Those cases instead "set forth the appropriate test where the witness is physically separated from the defendant" but did not address what test would apply when the witness testified in the presence of the defendant and jury under conditions that prevented the defendant and the jury from seeing the witness's eyes. (*Morales v. Artuz* (2d Cir. 2002) 281 F.3d 55, 58.)

22

In *People v. Sharp* (1994) 29 Cal.App.4th 1772 (*Sharp*), disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452, the court held that the defendant was not deprived of his right to confront witnesses when the prosecutor stood next to the witness stand so that a child victim did not have to look at the defendant when she was testifying about acts of sexual molestation, and the defendant was unable to see a portion of her face. The court stated: "A contrary holding would border on the absurd. Surely, appellant cannot be claiming a constitutional right to stare down or otherwise subtly intimidate a young child who would dare to testify against him. Nor can he claim a right to a particular seating arrangement in the courtroom. A witness who avoids the gaze of the defendant may be exhibiting fear, embarrassment, shyness, nervousness, indifference, mendacity, evasiveness, or a variety of other emotional states or character traits, some or all of which might bear on the witness's credibility. [¶] It is, however, the function of the jury to assess such demeanor evidence and 'draw its own conclusions' about the credibility of the witness and her testimony. [Citation.] There was no interference with the jury's ability to perform that function in this case." (*Sharp*, *supra*, at p. 1782.) In *Sharp*, the trial court had not made explicit findings as to the necessity of protecting the child victim from unnecessary emotional trauma, but the appellate court noted that before the prosecutor stood next to the child, it was "apparent from the record of her testimony that [she] was experiencing considerable distress and suffering inexplicable memory lapses about sex acts she had theretofore consistently reported." (*Id.* at p. 1783, fn. omitted.)

Courts in other states have held, as did the court in *Sharp*, that the Confrontation Clause is not violated when a child witness testifies in the witness chair that faces outside the defendant's line of sight. (E.g., *Stanger v. State* (Ind.Ct.App. 1989) 545 N.E.2d 1105, 1112 [no constitutional violation when the witness chair was angled slightly toward the jury and away from the defendant during child witnesses' testimony]; *Price v. State* (1996) 223 Ga. App. 185, 188 [477 S.E.2d 353, 358] [no constitutional violation when the defense table was positioned so that the defendant was unable to see the witnesses when they testified]; *State v. Hoyt* (Utah Ct.App. 1991) 806 P.2d 204, 209-210 [no constitutional violation when the defendant and his counsel were seated so as to remove a child victim from the defendant's direct line of sight]; *State v. Miller* (2001) 2001 ND 132 [631 N.W.2d 587, 593] [no error when a child witness did not face the defendant but faced the jury and the prosecutor during her testimony]; *Morales v. Artuz*, *supra*, 281 F.3d at pp. 60-61 [allowing a witness to wear sunglasses while testifying "resulted in only a minimal impairment of the jurors' opportunity to assess her credibility," and did not impair at all the "opportunity for the *witness* to see the *defendant* . . . ."]

In a case presenting facts analogous to those before us, the defendants, who operated a group home for the mentally ill, were charged with violating involuntary servitude law, among other crimes, based on their treatment of the residents. (*United States v. Kaufman* (10th Cir. 2008) 546 F.3d 1242, 1246.) At trial, the court ordered, "'Defendants will not have contact with the victims in any fashion during the trial without my permission. *To the extent possible, defendants will avoid eye contact with the victims when they are in court. I don't want to deal with complaints that defendants are*

24

*trying to influence or intimidate victims through eye contact.'"* (*Id.* at p. 1251, original italics.) On appeal, the defendants contended that order violated their Confrontation Clause rights (*Kaufman*, *supra*, at p. 1252) and further argued that the trial court did not make sufficient findings under *Craig* as to the necessity for such an order (*Kaufman*, *supra*, at p. 1255). The court assumed that the trial court had erred in its order because it "heard no evidence regarding the justification for the order and made no particularized findings." (*Id.* at p. 1257.) The court nonetheless found that the error was harmless. The court distinguished cases, such as *Coy*, in which a screen prevented the defendant and the witness from seeing each other and prevented the jury from seeing the witness. (*Kaufman*, *supra*, at p. 1257.)

Here, likewise, even if we assume the trial court erred by failing to make particularized findings as to the justification for its order under *Craig*, we find the error harmless. The defendant could see the witnesses and they could see him. Likewise, the jury could see the witnesses, and they could see the jury. The important principles underlying the Confrontation Clause were therefore satisfied.

In *People v. Gonzales* (2012) 54 Cal.4th 1234, the defendant contended his right to confront witnesses was violated when a child victim's videotaped testimony from the preliminary hearing was introduced into evidence after the court found the child was incompetent to testify at trial. At the preliminary hearing, the court had ordered that the child witnesses be seated at an angle, not directly facing the defendants, although the lawyers had eye contact with the children and the children could look around the courtroom and make eye contact with the defendant if they wished. (*Id.* at p. 1265.) The

court first noted that the defendant had no right to confront witnesses at the preliminary hearing and the court conducting that hearing had no reason to make *Craig* findings. (*Gonzales*, *supra*, at p. 1267.)  The court cited *Sharp* with approval and noted that "[o]ther state courts have approved the use of similar seating arrangements, without the findings required by *Craig*." (*Gonzales*, *supra*, at p. 1267, fn. 17 [collecting cases].)  We conclude, as did the court in *Gonzales*, that the trial court's order "satisfied the central concerns of the confrontation clause:  'physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.'" (*Id.* at p. 1268.)

### 4.  Assistance of Counsel

Defendant argues, in the alternative, that he was deprived of effective assistance of counsel because his trial attorney failed to object on the basis of the 14th Amendment due process rights and right to a fair trial.  "An ineffective assistance claim has two components:  A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. [Citation.]  To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.' [Citation.]." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521.)  Because we have concluded that any error in the trial court's ruling was harmless, defendant has failed to establish that his counsel provided ineffective assistance.

### B.  Admission of Evidence of Uncharged Sexual Offenses

Defendant contends the admission of evidence of the uncharged sexual offenses against Doe 3 under Evidence Code section 1108 deprived him of due process.  He

26

further argues that evidence of the uncharged sexual offenses should have been excluded under Evidence Code section 352.

### 1. Additional Background

Defense counsel moved in limine to exclude the testimony of Doe 3 under Evidence Code sections 1101, 1108, and 352. The trial court denied the motion, stating it had weighed the prejudicial effect of the evidence, "as well as considering Evidence Code Section 1108, [and] it appears . . . that on balance the evidence is appropriate before the trier of fact . . . ."

### 2. Evidence Code Section 1108

Defendant acknowledges that our Supreme Court has found Evidence Code section 1108 constitutional and that we are bound by that decision, but he raises the issue to preserve a future challenge. We reject his contention for the reasons stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 907.)

### 3. Evidence Code Section 352

We review the trial court's rulings as to the prejudicial effect of evidence under the deferential abuse of discretion standard. (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966.) The prejudice referred to in Evidence Code section 352 "'applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

In *People v. Harris* (1998) 60 Cal.App.4th 727, the court listed factors to apply under the balancing test of Evidence Code section 352 when evidence of other uncharged

sex crimes is offered under Evidence Code section 1108.  Those factors include:  (1) the inflammatory nature of the evidence; (2) the probability of confusion if the other crimes did not result in a conviction; (3) the remoteness of the other crimes; (4) the consumption of time to present the other crimes evidence; and (5) the probative value of the evidence.  (*People v.Harris*, *supra*, at pp. 737-740.)  The probative value of the evidence can include "consideration [of] the degree of similarity of the prior and current offenses, as similarity would tend to bolster the probative force of the evidence.  (*Id*. at p. 740.)

(a)  Inflammatoriness

Defendant argues the evidence of uncharged crimes involving Doe 3 was highly inflammatory, because Doe 3 was far younger when the crimes occurred and could have been viewed as more helpless than Does 1 and 2.  Doe 3 was no more than three years old when the uncharged crimes took place.  However, Doe 1 testified she was only six when the molestations began; thus, the age difference was not particularly dramatic.  Moreover, the types of acts committed against each child were similar; those acts included lewd touching and rubbing of the children's vaginal areas.  The fact that the charged and uncharged acts were similar made the evidence of the uncharged acts more probative, but not more prejudicial.

(b)  Possibility of confusion

Defendant argues that the fact that he was not convicted of the uncharged crimes weighed against admissibility of the evidence.  (*People v. Branch* (2001) 91 Cal.App.4th 274, 284  (*Branch*).)  In that case, the court stated:  "If the prior offense did not result in a conviction, that fact increases the danger that the jury may wish to punish the defendant

28

for the uncharged offenses and increases the likelihood of confusing the issues 'because the jury [has] to determine whether the uncharged offenses [in fact] occurred,'" and "the jury may have wanted to punish [the defendant] for committing the prior uncharged offenses, rather than assessing his guilt or innocence of the charged offenses. [Citation.]" (*Ibid.*)

In the present case, we perceive no likelihood the jury convicted defendant solely to punish him for his abuse of Doe 3 because there was nothing markedly different about Doe 3's testimony such that the jury would likely have believed her but not Does 1 and 2. (See *Branch*, *supra*, 91 Cal.App.4th at p. 284.)

(c) Remoteness

The uncharged crimes against Doe 3 were not remote in time. The uncharged conduct against Doe 3 took place at the same time as the abuse of Doe 2 and only a few years after the abuse of Doe 1 stopped or diminished. Courts have not found excessive remoteness when far longer periods have elapsed since the uncharged offenses. (E.g., *People v. Soto* (1998) 64 Cal.App.4th 966, 991 [evidence of uncharged acts that had taken place between 21 and 30 years before was admissible]; *Branch*, *supra*, 91 Cal.App.4th at p. 284 [30-year gap between charged and uncharged offenses]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1393-1395 [Fourth Dist., Div. Two] [similarities between charged offenses and uncharged offenses 15 to 22 years earlier "balanced out the remoteness"].)

(d) Consumption of time

Defendant argues the presentation of evidence of the uncharged crimes involved an undue consumption of time because Doe 3's testimony also required the presentation of the testimony of Dr. Horowitz and Tami V. Doe 1's testimony covered about 200 pages of the reporter's transcript and Doe 2's testimony covered about 120 pages. Testimonies of other prosecution witnesses covered approximately 66 more pages. In contrast, Doe 3's testimony covered only about 25 pages; Dr. Horowitz's testimony covered less than 30 pages, and Tami V.'s testimony covered about 62 pages. In *People v. Escudero* (2010) 183 Cal.App.4th 302, 312, the court held that the fact that testimony about prior sexual offenses constituted more than half of the witness testimony at the defendant's trial did not require the trial court to exclude it on the ground of undue consumption of time. Here, the challenged evidence encompassed a far smaller portion of the trial.

Considering all the relevant factors, we conclude the trial court did not abuse its discretion in finding the evidence of uncharged offenses more probative than prejudicial.

**C. Motion for Mistrial**

Defendant contends the trial court erred in denying his motion for mistrial after a witness testified defendant "had been found guilty" in dependency court, or, in the alternative, defendant was deprived of effective assistance of counsel in this regard.

*1. Additional Background*

The prosecution called Tami V., Doe 3's foster mother, to testify about behaviors she had observed in Doe 3 and about Doe 3's disclosure of the abuse. During cross-

30

examination, defense counsel elicited Tami V.'s testimony that she was Doe 3's prospective adoptive parent, and a hearing to finalize the adoption was scheduled for the following month. Tami V. testified it had always been her wish to adopt the child. In discussing the time of Doe 3's disclosure in relation to events in dependency court, defense counsel asked Tami V. "not to share" what those events have been. Defense counsel then elicited that Doe 3 had disclosed the abuse to Tami V. and Tami V. had told the social workers of the disclosure "right after something important happened in dependency court." Defense counsel later inquired when Tami V. had sent a certain email to the social worker, and Tami V. responded, "That was before the parents' rights were terminated." Defense counsel moved to strike the answer, but the trial court denied the motion.

Defense counsel continued to question Tami V. as to when Doe 3 had made certain statements to her about the abuse, and Tami V. responded that a second statement had been made "[f]our or five days after parents' rights were terminated . . . ." Defense counsel did not object, but instead continued, "Parents' rights were terminated. You know that . . . it is the time that you have the green light for adoption; correct?

During redirect examination, Tami V. stated she wanted to say something, and the prosecutor asked what she wanted to say. She responded: "That I was told from the beginning that [defendant] was already found guilty in the juvenile court system." Defense counsel objected and moved to strike the statement. The trial court ordered the statement stricken. Defense counsel stated she had a motion to make, and the trial court stated it would hear the motion later.

31

During the morning recess, defense counsel moved for a mistrial. She stated she had "specifically asked the witness not to talk about what the hearing was in dependency court," but the witness had "blurted out numerous times that parental rights [were] terminated." Counsel argued the testimony was so prejudicial a mistrial should be declared. The prosecutor responded there had been no pretrial hearing on the issue, and the witness had not been instructed to avoid the topic during her testimony. She further argued there had been no prejudice because defense counsel used the timing of the termination of parental rights as part of her strategy, in order to argue that Tami V. had a motive to lie.

The trial court denied the motion for mistrial. The court found no prejudice because the context in which the statement was made involved the timing of the disclosure, not the nature of the dependency proceeding. The court further pointed out that defense counsel had used the statement to cross-examine Tami V. about her motive.

### 2. *Standard of Review*

We review the denial of a motion for mistrial under the deferential abuse of discretion standard. (*People v. Cox* (2003) 30 Cal.4th 916, 953.)

### 3. *Analysis*

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ""a [defendant's] chances of receiving a fair trial

32

have been irreparably damaged.'"" [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198-199.) In that case, our Supreme Court held that the trial court did not abuse its discretion in denying a motion for mistrial when it concluded any prejudicial effect of a witness's volunteered testimony that the defendant had been in prison could be cured by an admonition to the jury. (*Id.* at p. 199.)

Here, the trial court struck Tami V.'s statement about defendant having been found guilty in dependency court. The trial court instructed the jury that it could not consider stricken testimony for any purpose. We find no abuse of discretion in the trial court's conclusion that striking the statement and admonishing the jury that it could not consider stricken testimony was sufficient to cure any harm. Moreover, as the trial court pointed out in denying the motion for mistrial, defense counsel used the statement to cross-examine Tami V. about her motives.

### 4. Assistance of Counsel

Defendant argues, in the alternative, that he was deprived of effective assistance of counsel because his trial attorney failed to move to exclude evidence that defendant's parental rights had been terminated through dependency proceedings and failed to request that Tami V. be ordered not to refer to such evidence.

When a defendant claims ineffective assistance of counsel, we presume counsel's conduct falls within the wide range of professional reasonableness, and we give great deference to counsel's tactical decisions. (*Strickland v. Washington* (1984) 466 U.S. 668, 681.) Thus, we do not reverse a conviction for ineffective assistance of counsel unless the record discloses there was no rational tactical purpose for counsel's act or omission.

33

(*People v. Frye* (1998) 18 Cal.4th 894, 979-980, overruled on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Here, as noted, defense counsel cross-examined Tami V. on her desire to adopt Doe 3 in an attempt to show Tami V.'s motive and bias. Defense counsel thus could have had a rational tactical purpose in allowing evidence of the termination of defendant's parental rights to come before the jury to bolster its impression of Tami V.'s bias. For that reason, we reject defendant's claim of ineffective assistance.

**D. Expert Testimony on CSAAS**

Defendant contends the trial court erred in allowing a prosecution witness to testify as an expert on CSAAS because it deprived him of his right to notice and exceeded the witness's expertise, or, in the alternative, he was denied effective assistance of counsel in this regard.

*1. Additional Background*

Defense counsel moved before trial to exclude expert witness testimony on CSAAS. The prosecutor stated he did not intend to call a CSAAS expert witness, and the trial court granted the motion.

In direct examination, Dr. Horowitz testified that she had performed a physical examination of Doe 3. She stated her information was that Doe 3 had not disclosed being abused. However, on cross-examination, she testified Doe 3 had actually denied being abused, and she wrote in her report that Doe 3 had denied being abused.

On redirect, the prosecutor asked Dr. Horowitz, based on her training and experience, if it was uncommon for young victims to initially deny being abused by their

34

father.  Defense counsel objected on the ground of lack of expertise and stated she wished to make another objection outside the presence of the jury.  The trial court overruled the objections.  Dr. Horowitz testified that initial denial of abuse was not uncommon, and disclosures often come piecemeal or not at all.  The prosecutor asked, "Are there certain factors that may make it more or less difficult for a child to disclose that they are being sexually molested?"  Dr. Horowitz responded, "Yes."  Defense counsel objected "as to expertise" and on the ground that the witness had not been listed as a CSAAS expert.  The trial court overruled the objections.

Dr. Horowitz then testified that many studies showed that victims of sexual abuse do not tell, that it was the norm for victims not to tell, and nondisclosure was common.  She listed as among the "many good reasons" for failure to disclose; that the victims did not want to upset their mother, get anyone in trouble, or lose their family; and they feared not being believed.  She agreed it was not uncommon for a child molestation victim to wait 10 or 20 years to tell.

On recross-examination, Dr. Horowitz stated she had qualified as a CSAAS expert in military court, had gone to "many trainings" on the subject, had talked to victims about it, and was familiar with Dr. Roland Summit's article on the subject.  She had taught CSAAS to students, and she thought that she was "as much an expert on what happens with accommodation syndrome as most people."  She testified as to the general concepts of CSAAS.  On redirect, Dr. Horowitz testified she did not base her opinion in this case on CSAAS, but rather, on Doe 3's behaviors despite her denial of abuse.

35

After Dr. Horowitz's testimony, defense counsel moved for a mistrial "on the grounds that we were not given any prior notice that this doctor was going to testify about the myths surrounding why children do not disclose sexual abuse earlier," and that the defense had not been provided discovery as to Dr. Horowitz's background. The prosecutor argued that defense counsel had opened the door to such testimony by establishing on cross-examination that Doe 3 had initially denied abuse and on recross by bringing in "this whole concept of child abuse accommodation syndrome." Defense counsel replied she had brought up the subject of Doe 3's denial of abuse to impeach Dr. Horowitz's direct testimony that abuse had not been disclosed.

The trial court denied the motion for mistrial, explaining, "The report does indicate that she took into consideration the history; that is, the apparent denial of the alleged victim in reaching her decision. And in her 5,000-plus examinations, she has— she indicated she has encountered denials on many occasions. And she opined on the research and her own training and experience regarding reasons for those denials. [¶] So I don't think the defense was blind-sided, in that that was a natural consequence of her testimony. And obviously counsel was aware of the studies, was able to raise the issue she wanted regarding the accommodation syndrome. And so I don't believe any prejudice has occurred to the defense."

### 2. *Lack of Notice*

As noted, the prosecutor represented to the court that it did not intend to call a CSAAS expert witness, and defendant argues the discovery provided by the prosecutor did not indicate that Dr. Horowitz would be called as a CSAAS expert. Defendant

36

argues, in the alternative, that he received ineffective assistance of counsel to the extent his counsel failed to assert a federal constitutional basis for objecting to Dr. Horowitz's testimony. Specifically, he argues the lack of notice violated his right to due process.

The purpose of the discovery statute is to prevent trial by ambush. (*People v. Cabral* (2004) 121 Cal.App.4th 748, 752.) However, as we discuss below, even if timely discovery was not provided, the CSAAS testimony was not prejudicial.

### 3. Scope of Expertise

Defendant contends there was no foundational showing that Dr. Horowitz was qualified as an expert in CSAAS because, among other things, she had never before qualified as such in judicial court, and her work as a physician focused on the physical aspects of abuse.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "'"We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion. [Citation.] Such abuse of discretion will be found only where '"the evidence shows that a witness *clearly lacks* qualification as an expert . . . ."' [Citation.]"' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 445.)

As recounted above, Dr. Horowitz had qualified as a CSAAS expert in military court, had gone to "many trainings" on the subject, had talked to victims about it, and was familiar with the seminal article on the subject, and had even taught CSAAS to students. Dr. Horowitz was amply qualified to testify on CSAAS.

37

*4. Opening the Door to CSAAS Testimony*

Defendant argues the defense did not open the door to CSAAS testimony. On direct examination, Dr. Horowitz testified that her information when she examined Doe 3 was that Doe 3 had not disclosed abuse. On cross-examination, defense counsel established that Doe 3 had in fact *denied* being abused. Based on that denial, the prosecutor argued that the defense had opened the door to an explanation for Doe 3's conduct.

CSAAS testimony is admissible "for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. [Citations.]" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.) When defense counsel elicited testimony that Doe 3 had not failed to disclose molestation but had in fact denied it had occurred, CSAAS testimony became relevant to explain to the jury the reasons a child might deny abuse.

*5. Prejudice*

Defendant argues the error in allowing Dr. Horowitz to testify as a CSAAS expert was prejudicial. He contends the case was close, and Doe 3 was an important witness used to shore up the weak credibility of Does 1 and 2. In context, even if we assume error, we find the error was harmless.

Dr. Horowitz's testimony relating to CSAAS covered only two pages of testimony on the prosecutor's redirect, and her testimony covered only general concepts in broad outline without reference to the facts of the case. On recross, defense counsel elicited another four pages on the topic, most of which related to how the syndrome had been

38

developed and used. On further redirect, Dr. Horowitz confirmed she had not based any of her opinions and conclusions on the syndrome.

Here, the trial was lengthy, and both sides presented extensive evidence. The CSAAS testimony, such as it was, arose in the context of Dr. Horowitz's examination of Doe 3, not one of the charged victims. Moreover, defense counsel established through cross-examination of Dr. Horowitz that Doe 3's denial did not mean she was or was not touched. We conclude that defendant has failed to show any reasonable probability that the outcome of his trial would have been different had the evidence been excluded.

**E. Evidence of CPS Contacts**

Defendant contends the trial court erred in admitting evidence of the number of CPS contacts with defendant's household in the year before his arrest.

*1. Additional Background*

During pretrial discussions, defense counsel objected on hearsay and Confrontation Clause grounds to the introduction of evidence of prior CPS contacts with defendant's family. Defense counsel later stated she would be putting into evidence the victims' denials of abuse made during CPS investigations in 2002 and 2007.

During cross-examination, defense counsel asked Doe 1 about her conversation in 2007 with a CPS worker and asked Doe 1 if she "had a lot of contact with CPS," and Doe 1 responded, "Yes, I did." Defense counsel also asked about the 2002 CPS contact. Defense counsel questioned Doe 2 about CPS contacts in Orange County and clarified that Doe 2 had been interviewed by "numerous CPS agents over the years." Defense counsel elicited from Deputy Devine that he had learned of CPS referrals of the family in

2002 and 2007, and Doe 1 had denied sexual abuse each time. Defense counsel also called CPS social worker Tricia Hoyle to testify about statements Doe 1 had made after being placed in foster care. During cross-examination, the prosecutor asked Hoyle about the standard process and procedure when CPS contacts a household and asked how many times CPS had contacted defendant's household. Defense counsel objected on the grounds the evidence was not relevant and was outside the scope of direct examination. She further argued she had had no notice of the evidence, and it would be inflammatory and unduly prejudicial under Evidence Code section 352.

The trial court ruled that Hoyle could testify as to the number of CPS contacts in the year before defendant's arrest but not as to the nature of those contacts. The trial court stated the evidence was relevant to show that "they were in the watchful eye of CPS . . . during that 12-month period." Hoyle then testified that CPS contacted the household five times in the 12 months before August 2008.

Thereafter, defense counsel questioned T.S. about the 2002 and 2007 contacts with CPS agents. }

### 2. *Analysis*

Defendant argues the number of CPS contacts with his family was irrelevant and therefore inadmissible. (Evid. Code, § 210.)

Even assuming for purposes of argument that evidence of the number of CPS contacts was not relevant, defendant suffered no prejudice from the admission of that evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Defense counsel elicited evidence of CPS involvement with the family, as recounted above, and used that

40

evidence to highlight the number of occasions on which the victims had denied abuse. Counsel argued, "Numerous denials of child abuse by the witnesses. Not just in one county, but two counties over a period of five years. Numerous denials and with respect to [Doe 2], countless denials."

### F. Prosecutorial Misconduct

Defendant contends the prosecutor committed misconduct during cross-examination of T.S. and during argument to the jury, or, in the alternative, defendant was denied effective assistance of counsel in this regard. Specifically, defendant claims the prosecutor (1) improperly questioned T.S. about her failure to cooperate with police based on the advice of her attorney and then improperly commented on the same during closing argument; (2) improperly questioned T.S. about defendant's desire to see a warrant before allowing the police into their home and then improperly commented on the same during closing argument; (3) improperly questioned T.S. about whether defendant did not want to allow the police to enter because there were drugs inside the house; (4) improperly began closing argument by retelling the facts from the perspective of Doe 1; and (5) improperly arguing during closing argument that child molesters "don't get rehabilitated" and they continue to molest children, as evidenced by the abuse of Does 1, 2, and 3.

#### 1. Forfeiture

Although defendant claims five instances of prosecutorial misconduct, his counsel failed to raise timely objections. With respect to defendant's first, second, fourth, and fifth claims, his trial counsel raised no objections at trial and requested no admonitions to

41

the jury.  "'"A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 965-966.)

With respect to defendant's third claim, the trial court sustained a defense objection to the prosecutor's question to T.S. as to whether defendant did not want to open the door to police because there were drugs in the house.  T.S. had testified she did not answer the door when the police came because she was asleep and did not hear them knocking.  Defense counsel later moved for mistrial, arguing the prosecutor did not have a good faith belief in the truth of the evidence he was trying to elicit.  The trial court denied the motion for mistrial on the ground the witness had stated there had been no drugs in the house and no prejudice had occurred to defendant.  However, defense counsel failed to request an admonition.  We therefore deem that claim forfeited as well. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [the failure to request an admonition forfeits a claim of prosecutorial misconduct if an admonition would have cured the harm caused by the misconduct].)

An exception to the general rule of forfeiture applies when "misconduct was pervasive, defense counsel repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile . . . ." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 501-502.)  Defendant has not shown that the exception applies in his case.  Instead, the trial court sustained numerous defense objections throughout the trial.

42

### 2. *Ineffective Assistance of Counsel*

Defendant argues, in the alternative, that his counsel provided ineffective assistance by failing to object or to request an admonition.  A decision whether to object to prosecutorial misconduct is "inherently tactical" and "the failure to object will rarely establish ineffective assistance.  [Citations.]"  (*People v. Maury* (2003) 30 Cal.4th 342, 419.)  A legitimate tactical purpose for failing to object is counsel's desire to not draw further attention to the comments or testimony.  (*People v. Ghent* (1987) 43 Cal.3d 739, 773 ["Counsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments"].)

### G.  Cumulative Error Doctrine

Defendant contends the cumulative error doctrine requires reversal.  We conclude that any errors, whether considered singly or cumulatively, were not prejudicial.

### IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

MCKINSTER
J.

43